# Exhibit C

1

1    IN THE UNITED STATES DISTRICT COURT

        FOR THE DISTRICT OF DELAWARE

2                   - - -

EQUAL EMPLOYMENT              ) CIVIL ACTION

3  OPPORTUNITY COMMISSION,     )

                              )

4                             )

                Plaintiff,    )

5      -vs-                    )

                              )

6  CITIBANK DELAWARE,         )

                              )

7                             )

                Defendant.    ) NO. 05-348-JJF

8                   - - -

9              Oral deposition of SARA ZOBEL, taken

10  in the offices of the U.S. EQUAL EMPLOYMENT

11  OPPORTUNITY COMMISSION, Philadelphia District

12  Office, The Bourse, Suite 400, 21 South Fifth

13  Street, Philadelphia, Pennsylvania 19106, on

14  Wednesday, May 24, 2006, beginning at

15  approximately 11:45 a.m., before Joseph J.

16  Pignatelli, a Registered Professional Reporter and

17  Commissioner in and for the Commonwealth of

18  Pennsylvania.

19                   - - -

20

21

22          ESQUIRE DEPOSITION SERVICES

         Four Penn Center, 12th Floor

23      1600 John F. Kennedy Boulevard

       Philadelphia, Pennsylvania 19103

24             (215) 988-9191

```
 1   APPEARANCES:

 2

             U.S. EQUAL EMPLOYMENT OPPORTUNITY
 3           COMMISSION
             BY: CYNTHIA A. LOCKE, ESQUIRE
 4           Philadelphia District Office
             The Bourse, Suite 400
 5           21 South Fifth Street
             Philadelphia, Pennsylvania 19106
 6           (215) 440-2683
             -- Representing the Plaintiff

 7

 8

 9           MORGAN, LEWIS & BOCKIUS, LLP
             BY: SARAH E. PONTOSKI, ESQUIRE
10           1701 Market Street
             Philadelphia, Pennsylvania 19103
11           (215) 963-5028
             -- Representing the Defendant

12

13                   - - -

14

15

16

17

18

19

20

21

22

23

24
```

SARA ZOBEL

1           (It is hereby stipulated and agreed

2      by and between counsel for the respective

3      parties that sealing, certification, and

4      filing are hereby waived; and that all

5      objections, except as to the form of the

6      question, are reserved until the time of

7      trial.)

8                    -  -  -

9           SARA ZOBEL, after having been first

10     duly sworn, was examined and testified as

11     follows:

12                    -  -  -

13                  EXAMINATION

14                    -  -  -

15   BY MS. LOCKE:

16   Q.    Ms. Zobel, my name is Cynthia Locke and I

17   represent the United States Equal Employment

18   Opportunity Commission in this lawsuit we have

19   brought under the Americans With Disabilities Act

20   on behalf of Terry Jenkins.

21           MS. LOCKE: Off the record.

22                    -  -  -

23           (Whereupon, a discussion was held off

24      the record.)

SARA ZOBEL

```
1                        - - -

2     BY MS. LOCKE:

3     Q.      Ms. Zobel, have you ever had your

4     deposition taken before?

5     A.      No, I have not.

6     Q.      Has your attorney explained to you what the

7     deposition process is?

8     A.      Yes, yes.

9     Q.      Do you have any questions about the

10    process?

11    A.      No.

12    Q.      Do you understand that you're under oath?

13    A.      Yes.

14    Q.      And do you understand that if you lie, you

15    could been subject to prosecution for perjury?

16    A.      Yes.

17    Q.      Are you currently taking any drugs or

18    medication that would impair your ability to

19    answer questions completely and accurately here

20    today?

21    A.      No.

22    Q.      Is there any other reason why feel you

23    could not answer questions completely and

24    accurately here today?
```

SARA ZOBEL

```
 1    A.      No.

 2    Q.      If you do not understand a question, I will

 3    ask you to let me know.  Is that acceptable?

 4    A.      Yes.

 5    Q.      And you're entitled to take breaks as

 6    needed, except we prefer that breaks not be taken

 7    when a question is pending.  Is that acceptable?

 8    A.      Yes.

 9    Q.      What is your current address?

10    A.      My current address is 200 West Sixtieth

11    Street, Apartment 3A, New York, New York 10023.

12    Q.      And you're currently an employee of

13    Citibank?

14    A.      Citigroup.

15    Q.      What is the difference between Citigroup

16    and Citibank?

17            MS. PONTOSKI:  I'm going to object to

18         the question to the extent that it calls

19         for speculation and the witness does not

20         know this line of questioning.

21    BY MS. LOCKE:

22    Q.      Just from your -- not as an expert but from

23    what your understanding is at the present time.

24            Is there any connection at all
```

SARA ZOBEL

```
 1    between Citigroup and Citibank?
 2    A.      Citigroup is the parent company.
 3    Q.      Where is Citigroup headquartered?
 4    A.      New York.
 5    Q.      So it's the parent company of Citibank
 6    Delaware?
 7                MS. PONTOSKI:  Again I'm just going
 8            to object.  I'm just going to put a
 9            standing objection to this entire line of
10            questioning to the extent witness doesn't
11            know and you're asking her to speculate.
12    BY MS. LOCKE:
13    Q.      I'm not asking you to speculate, but from
14    what your knowledge is, you told me that Citigroup
15    is the parent of Citibank; correct?
16    A.      Correct?
17    Q.      And were you employed by Citigroup in 2002?
18    A.      Yes.
19    Q.      As part of your duties as an employee of
20    Citigroup, did you have any work chores or
21    responsibilities for Citibank employees?
22    A.      I was an HR generalist for employees who
23    were part of the corporate investment bank
24    division of Citigroup.
```

SARA ZOBEL

1   Q.      Of Citigroup?

2   A.      Yes.

3   Q.      Well, the woman on whose behalf we've

4   brought this case, Ms. Terry Jenkins, she was

5   employed in the global loans department of

6   Citibank.  Would she have come under your work

7   chores in any way?

8   A.      She would have been part of a population

9   that I supported that at the time that I was a

10  generalist which was part of the corporate

11  investment bank of Citigroup.

12  Q.      Part of the corporate investment banking?

13  A.      Bank.

14  Q.      B-A-N-K?

15  A.      Yes.

16  Q.      How long have you been employed by

17  Citigroup?

18  A.      About five years.

19  Q.      So starting in about 2001?

20  A.      The fall of 2000.

21  Q.      Were you always headquartered in Manhattan?

22  A.      Yes.

23  Q.      We'll get to that a little bit more later,

24  I'm just trying to clarify that.

SARA ZOBEL

1          Have you ever been fired from any

2    jobs?

3    A.     No.

4    Q.     Have you ever been asked to resign?

5    A.     No.

6    Q.     Have you ever been arrested?

7    A.     No.

8    Q.     Have you ever been a plaintiff or defendant

9    in a lawsuit?

10   A.     No.

11   Q.     Have you ever been called to testify at an

12   administrative hearing on a discrimination claim?

13   A.     No.

14   Q.     Other than counsel, who did you speak to

15   today about this deposition?

16   A.     No one.

17   Q.     About this lawsuit?

18   A.     No one.

19   Q.     Did you review any document in preparation

20   for this deposition?

21          MS. PONTOSKI:  Objection to the

22          extent that this calls for information

23          that is protected by the attorney-client

24          privilege.

SARA ZOBEL

1            The witness can answer that she has

2        reviewed documents, however, she cannot

3        answer the discussions that she had with

4        counsel regarding the review of those

5        documents.

6   BY MS. LOCKE:

7   Q.      Did you review any documents in

8   preparation?

9   A.      Yes.

10  Q.      What did you review?

11  A.      What was general documents pertaining to

12  the case.

13  Q.      Where did those documents come from?

14  A.      My attorney.

15            MS. PONTOSKI:  Again I'm going to

16        object.

17  BY MS. LOCKE:

18  Q.      I'm not asking you for anything that Ms.

19  Pontoski gave you, but what I'm trying to find out

20  is:  The documents that were reviewed, were they

21  from your personal file from Citigroup?

22  A.      No.

23  Q.      Were they documents you had ever seen

24  before?

SARA ZOBEL

```
 1              MS. PONTOSKI:  Object to the form.
 2          "Seen before" when?
 3  BY MS. LOCKE:
 4  Q.     At any time.
 5  A.     Can you repeat the question?
 6  Q.     The documents that you reviewed that you
 7  told me were not part of your file at Citigroup,
 8  had you ever seen any of these documents before at
 9  any time?
10              MS. PONTOSKI:  Object to the form.
11          Are you asking at any time before she
12          reviewed them?
13  BY MS. LOCKE:
14  Q.     At any time in your lifetime.
15  A.     I don't remember if I had seen all them
16  before.
17  Q.     Do you recall if you saw some of them
18  before?
19  A.     Yes.
20  Q.     Would that have been as part of your
21  employment duties for Citigroup?
22  A.     Yes.
23  Q.     But there may be some that you had never
24  seen before in your lifetime; is that correct?
```

SARA ZOBEL

1   A.      I don't remember.

2   Q.      Without belaboring the point, I'm

3   interested in just finding out about Citigroup

4   briefly.  You told me that it's the parent of

5   Citibank.

6   A.      That's my definition, yes.

7   Q.      Do they have branches other than in New

8   York City, to your knowledge?

9   A.      Yes.  It's a very big company.

10  Q.      You told me that you've been with Citigroup

11  since about the fall of 2000.

12  A.      Correct.

13  Q.      Have you always been a human resources

14  generalist for Citigroup?

15  A.      Yes.

16  Q.      What were your duties in the year 2002?

17  And just to maybe clarify that:  Were they the

18  same as they are now?

19  A.      Yes.

20  Q.      So I'm interested in focusing on the time

21  period really between November 2001 through May of

22  2002, so when I'm asking you about your duties,

23  I'm interested in knowing what your job duties

24  were then.

SARA ZOBEL

1    A.       Okay.

2    Q.       Can you tell me what they were?

3    A.       I worked with business managers to ensure

4    company policy.  I worked on compensation, paying

5    employees, recruitment, benefits, and when I say

6    "benefits," I specifically mean working with

7    employees during open enrollment.

8    Q.       Are you finished?

9    A.       Yes.

10   Q.       And are those basically your same job

11   duties today?

12   A.       Yes.

13   Q.       Who was your supervisor?

14   A.       My supervisor was Kathy Negron,

15   N-E-G-R-O-N.

16   Q.       Other than some work you do involving

17   employees at Citibank Delaware, what other

18   locations, in what other locations do you work

19   with employees as part of your job for Citigroup

20   at the present time?

21   A.       Can you repeat the question?

22   Q.       Let's start with, let's go back to 2002.

23   Other than working with employees in Citibank

24   Delaware, what other places or locations or sites

SARA ZOBEL

1   did you have job responsibilities with employees?

2   A.      Then?

3   Q.      Then.

4   A.      New York.

5   Q.      What about now?

6   A.      Now I'm a global generalist, so I have

7   global responsibility, but if I limit it to the

8   U.S., New York, Houston, Chicago and San

9   Francisco.

10  Q.      At Citibank Delaware, that's what the focus

11  of my questions are going to be because that's

12  where the events of this lawsuit took place where

13  Ms. Jenkins was employed, do you have any

14  involvement in receiving doctors' notes written

15  for employees who request sick leave at Citibank

16  who are employed at Citibank Delaware?

17  A.      No.

18  Q.      Do you have any knowledge as to where the

19  doctors' notes are maintained for Citibank

20  Delaware employees?

21          MS. PONTOSKI:  Object to the form of

22          the question.  You're assuming that

23          Citibank Delaware maintains such

24          documents.

SARA ZOBEL

```
 1   BY MS. LOCKE:

 2   Q.      You may answer.

 3   A.      I'm sorry, can you repeat the question?

 4             MS. LOCKE: Can you read the question

 5         back?

 6                    - - -

 7             (Whereupon, the court reporter read

 8         the pending question.)

 9                    - - -

10             THE WITNESS: No.

11   BY MS. LOCKE:

12   Q.      Have you ever had occasion to look at them?

13   A.      No.

14   Q.      Do you know if there is a procedure

15   followed by managers or supervisors at Citibank

16   Delaware for referring employees for consideration

17   for disability?

18   A.      Yes.

19   Q.      What is that procedure?

20   A.      They are directed to call the vendor, the

21   disability vendor.

22   Q.      What do you mean by "the disability

23   vendor"?

24   A.      There is a an external vendor that manages
```

SARA ZOBEL

1    the process.

2    Q.    What is the source of your knowledge that

3    the employees are directed to call the disability

4    vendor?

5    A.    In the handbook.

6    Q.    In the Citibank Handbook?

7    A.    In the corporate investment bank handbook.

8    Q.    Is that handbook developed and disseminated

9    by Citibank?

10   A.    I don't know if it's disseminated.

11   Q.    Do you know who wrote it, whether it's the

12   property of Citibank or Citigroup?

13   A.    I don't know.

14   Q.    Is Citigroup one of these external vendors?

15   A.    No.

16   Q.    Is MetLife one of these external vendors?

17   A.    Yes.

18   Q.    As part of your duties at Citigroup, did

19   you have any communications with MetLife?

20   A.    Yes.

21   Q.    What was the nature?  Well, let's go to the

22   year 2000 which is when the questions will be

23   focused unless I tell you otherwise.

24               In the year 2000, what was the nature

SARA ZOBEL

1   of your communications with MetLife as part of

2   your job for Citigroup?

3   A.      In 2000 or 2002?

4   Q.      2002.

5   A.      If I needed to find out where an employee

6   was in process, I would call MetLife to speak to a

7   case manager.

8   Q.      As far as an employee at Citibank Delaware

9   who was seeking to receive disability benefits,

10  did you have any role or responsibility in that

11  area?

12  A.      Employees were notified.  If asked how,

13  employees would have been directed to call the

14  disability vendor.  If they asked me, I would have

15  said, please call MetLife, the vendor at the time.

16  Q.      You would have asked them to call MetLife

17  directly?

18  A.      I would have directed them to if they asked

19  what should they do, that would have been my

20  direction.

21  Q.      Now, you had said, you as part of your job

22  duties would call MetLife to speak to a case

23  manager if you wanted to know where an employee

24  was in the process.  Can you expand on what you

SARA ZOBEL

1    mean by that?

2    A.      If an employee needs to spend time out of

3    the office for a medical reason, we would have

4    called MetLife to find out if the employee's case

5    was being reviewed, if a decision had been made,

6    if the vendor was waiting for additional

7    information, if the vendor was reaching out to the

8    employee to give them the most recent update.

9    Q.      You said to see if the case was being

10   reviewed, if a decision was made, if the vendor

11   was reaching out for more information, and I'm

12   sorry, I didn't get the other --

13   A.      If a decision had been made, if the

14   employee had been receiving, if the employee had

15   been sent information from MetLife.

16   Q.      Did you have any responsibility to obtain

17   medical information to be produced to MetLife on

18   behalf of an employee?

19   A.      No.

20   Q.      Did you have any responsibility to contact

21   physicians to ask them to produce information on

22   behalf of a Citibank Delaware employee?

23   A.      No.

24   Q.      Did you review the decisions made by

SARA ZOBEL

```
1    MetLife as to whether or not a Citibank employee
2    was covered under disability?
3                MS. PONTOSKI:  Object to the form of
4            the question.  What do you mean by
5            "review"?
6    BY MS. LOCKE:
7    Q.      Can you answer that?
8    A.      MetLife would make the decision.  Whatever
9    the decision, we viewed to be final.  We didn't
10   review, we didn't take it as guidance.
11   Q.      Did you conduct an independent assessment
12   as to whether a Citibank Delaware employee was
13   disabled?
14   A.      No.
15   Q.      Do you know whether anyone in the -- and I
16   take it you work -- do you work in human
17   resources?
18   A.      Yes.
19   Q.      Do you know whether anyone in your human
20   resources department conducted such an assessment?
21   A.      No.
22   Q.      They did not or you don't know?
23   A.      They would not.  It's MetLife's job to do
24   that.
```

SARA ZOBEL

1    Q.      In the course of your duties, is it part of

2    your duties to provide any sort of documents to

3    MetLife, any kind of documents at all?

4    A.      MetLife may ask for job specific

5    information, such as a job description for the

6    number of hours that the employee needs to work.

7    Q.      You're saying you would provide those?

8    A.      We would provide that, yes.

9    Q.      Any other types of documents that you have

10   provided to MetLife in the past?

11   A.      No.

12   Q.      Do you ever see the medical information

13   sent to MetLife on behalf of Citibank employees?

14   A.      No.

15   Q.      Did anyone from the human resources

16   department in which you work as part of their job

17   review this medical information?

18   A.      No.

19   Q.      Do you as part of your job make

20   determinations as to whether Citibank Delaware

21   employees are disabled, I'm sorry, covered by the

22   Americans With Disabilities Act?

23            MS. PONTOSKI:  Objection to the form

24        of the question to the extent it calls for

SARA ZOBEL

1    A.      Loan administrator.

2    Q.      Do you know if she worked in global loans?

3    A.      Yes.

4    Q.      Was she part of the corporate investment

5    bank of Citigroup?

6    A.      Yes.

7    Q.      Are you aware that Ms. Jenkins was

8    attempting to receive disability benefits?

9    A.      Yes.

10   Q.      How did you become aware of that?

11   A.      She was out of the office.  MetLife

12   notified Citigroup that they had been in contact

13   and were reviewing her case.

14   Q.      Did MetLife notify you?

15   A.      I don't remember.

16   Q.      Do you recall whether you sent any

17   information to anyone in MetLife in connection

18   with Terry Jenkins?

19   A.      I don't remember.

20   Q.      Did you ever see any doctors' notes

21   referring to Ms. Jenkins?

22   A.      No.

23   Q.      Did you ever see any leave slips submitted

24   by Ms. Jenkins's physicians if, in fact, such were

SARA ZOBEL

1    submitted?

2    A.      No.

3    Q.      And did you ever review any of Ms.

4    Jenkins's medical information?

5    A.      No.

6    Q.      Did you ever communicate with any of Ms.

7    Jenkins's physicians in order to get information

8    to assist in the determination whether she was

9    disabled?

10   A.      No.

11   Q.      Did you at some point in time learn who Ms.

12   Jenkins's case worker was at MetLife?

13   A.      Yes.

14   Q.      Who was that?

15   A.      I remember it being Paula Bianchi.

16   Q.      How did this come to your attention?

17   A.      How did it come to my attention when?

18   Q.      That is Paula was her case worker?

19   A.      At the time when the processes -- when you

20   called the 1(800) number as an employer, you're

21   either directed to a general customer service

22   person or directed to the case manager through a

23   phone system.

24   Q.      So in this case what happened?

SARA ZOBEL

1   A.      Specifically how did I get in touch with

2   Paula?

3   Q.      How did you find out that Paula was the

4   case worker?

5   A.      Either it would have been released to me

6   from a case manager who answered the phone or if

7   Paula requested specific information, like I

8   mentioned the job description, she would have

9   introduced herself to me and she would have

10  contacted me.

11  Q.      Did Paula Bianchi, did she ever share with

12  you, did she ever discuss with you any of the

13  medical information she received on Terry Jenkins?

14  A.      What type of medical information?

15  Q.      Any kind of medical information?

16  A.      No.

17  Q.      Did she ever discuss with you any doctors'

18  Notes or leave slips that she received on behalf

19  of Terry Jenkins?

20          MS. PONTOSKI:  Object to the form of

21      the question.  Are you talking about the

22      content of the slip or the fact that she

23      had received them from the doctor?

24          MS. LOCKE:  Anything.  The fact did

SARA ZOBEL

```
 1              she receive them --
 2                   THE  WITNESS:  She  would  have,  Paula
 3              would  have  let  me  know  that  they  had
 4              received  additional  information  from
 5              the  medical  office,  she  would  not  have
 6              released  to  me  nor  would  I  have  asked  nor
 7              did  I  ask  what  the  contents  of  that  was.
 8                   She  would  have  said,  we've  received
 9              additional  information,  it's  being
10              reviewed.
11   BY MS.  LOCKE:
12   Q.      Did  she  ever  discuss  with  you  the  length  of
13   time,  if  any,  that  Ms.  Jenkins's  physician  had
14   requested  that  Ms.  Jenkins  be  given  for  leave?
15   A.      She  would  not  have  shared  with  me  what  the
16   physicians  have  requested.   MetLife  would  have
17   just  provided  us  with  their  dates.
18   Q.      What  do  you  mean  by  "their  dates"?
19   A.      What  medical  information  would  have  been
20   submitted  to  MetLife  would  have  been  reviewed  by
21   MetLife.   Upon  that  review,  they  would  have  made  a
22   decision,  MetLife  would  have  made  a  decision,  and
23   MetLife  would  have  been  in  contact  with  the
24   manager  with  dates,  either  confirming  continual
```

SARA ZOBEL

1  disability or an end date and telling us what I

2  call a release date, when Terry or anyone could

3  have returned to work.

4  Q.    Did you ever ask Ms. Bianchi what length of

5  time any of Ms. Jenkins's physicians had requested

6  she be kept out of work?

7  A.    No.

8  Q.    Are you familiar with whether or not

9  Citigroup's policies under any circumstances

10 permit a person on disability to be out of work

11 for twelve months?

12 A.    Any of our policies?

13 Q.    Yes.

14 A.    For approved leaves, yes.

15 Q.    And would this be, to your knowledge,

16 contained in the employee handbook?

17 A.    It should be contained in the handbook,

18 yes.

19 Q.    Do you know how long that policy had been

20 in effect?

21 A.    No.

22 Q.    Had it been in effect during the length of

23 time you have been working there?

24 A.    I don't remember.

SARA ZOBEL

1           have the right to ask the witness what she

2           knows about a document before you make a

3           statement.

4                   MS. PONTOSKI: I have the right to --

5                   MS. LOCKE:  I would like you to step

6           outside.

7                           -  -  -

8                   (Whereupon, Ms. Locke and Ms.

9           Pontoski leave and return to conference

10          room.)

11                          -  -  -

12                  MS. LOCKE: We are back on the record

13          and we're questioning the witness on,

14          is it Zobel-5?

15                  And I'm going to allow Ms. Pontoski

16          at her request to make a statement that she

17          wants to make for the record with regard to

18          an item that she sees on the bottom of the

19          letter.  Go ahead.

20                  MS. PONTOSKI:  I'd just like to note

21          that the bottom of the letter contains

22          Bates label ML0098 through ML0099.

23                  MS. LOCKE:  And thank you very much.

24      BY MS. LOCKE:

SARA ZOBEL

1    Q.    Ms. Zobel, have you ever seen this document

2    before?

3    A.    No.

4    Q.    Have ever seen a letter that one of Ms.

5    Jenkins's physicians, Dr. Senu-Oke, that he

6    produced to MetLife in response to requests for

7    more information?

8            MS. PONTOSKI:  I'm going to object.

9        It was asked and answered, because you have

10       already asked her that question.

11           MS. LOCKE: I'm allowed to ask a more

12       specific question.

13           THE WITNESS:  No.

14   BY MS. LOCKE:

15   Q.    Are you aware of whether or not MetLife was

16   seeking additional information from Ms. Jenkins

17   and/or her physician?

18   A.    No.

19           MS. LOCKE:  Mark this as Zobel-6,

20       please.

21                - - -

22           (Whereupon, a three-page document

23       Bates stamped CB00272 through CB00274

24       was marked for identification as Exhibit

SARA ZOBEL

1   attempt to get additional supportive clinical

2   information on Ms. Jenkins?

3   A.      No.

4   Q.      Did you ask anyone at MetLife whether they

5   followed through with the doctor to get more

6   information?

7   A.      I may have.

8   Q.      Did they share with you what information

9   they received?

10  A.      No.

11              Do you mind if we break now?

12  Q.      You mean for the lunch break.

13              MS. LOCKE:  Off the record.

14                  - - -

15              (Whereupon, a discussion was held off

16          the record.)

17                  - - -

18              (Whereupon, a luncheon break was

19          taken.)

20                  - - -

21              MS. LOCKE:    Please mark this as

22          Exhibit 7, please.

23                  - - -

24              (Whereupon, a handwritten document

SARA ZOBEL

```
 1                        - - -
 2    BY MS. LOCKE:
 3    Q.      I'm going to ask you to take a minute to
 4    review Zobel-9.
 5    A.      Okay.
 6    Q.      What is Zobel-9?
 7    A.      It's a letter signed by me that was sent to
 8    Terry asking her to get in touch with us.
 9    Q.      What is the date on the letter?
10    A.      May seventh, 2002.
11    Q.      And can you read the first sentence of the
12    letter?
13    A.      "On April twenty-sixth, 2002, a letter from
14    MetLife was mailed to your attention at the above
15    address."
16    Q.      Continue.
17    A.      "This letter stated that your disability
18    claim number 590201098659 was appealed and the
19    decision of denial upheld."
20    Q.      Now, what letter were you referring to when
21    you wrote that letter to Ms. Jenkins on May
22    seventh, 2002?
23    A.      I don't know.
24    Q.      Is Zobel Number 8 an April twenty-fifth,
```

SARA ZOBEL

```
1   2002 letter from MetLife mailed to Terry Jenkins
2   at the above address?
3   A.      Yes.
4   Q.      And does this letter state that her
5   disability claim was appealed and the decision of
6   denial upheld, in words or substance?
7   A.      Yes.
8   Q.      So is it possible that the letter you were
9   referring to in the first paragraph of your May
10  seventh, 2002 letter is, in fact, the April
11  twenty-fifth, 2002 letter marked Zobel-8?
12          MS. PONTOSKI:  Objection to the form
13          of the question.  It calls for the witness
14          to speculate.
15          THE WITNESS: I would not have
16          received the April twenty-fifth, 2002
17          letter, I would have received confirmation
18          from MetLife.  It could have been over the
19          phone that they had sent a letter and
20          that's all I would have needed.
21  BY MS. LOCKE:
22  Q.      So you're not answering my question though.
23  Do you know whether this is the letter, whether
24  Zobel-8 is the letter that you're referring in
```

SARA ZOBEL

1    Q.      And here we have on Zobel Number 8, an

2    actual April twenty-fifth, 2002 letter to Terry

3    denying her benefits.  Now is it possible that

4    this is the letter that both of these documents

5    are referring to?

6              MS. PONTOSKI:  I'm going to object to

7         the question to the extent that it calls

8         for speculation, and to the extent

9         that the witness has already answered this

10        question.

11             THE WITNESS: It could be the letter,

12        I would not have been in receipt of that

13        letter.

14   BY MS. LOCKE:

15   Q.      Why is that?

16   A.      That information wouldn't have been

17   released to me.  What information would have been

18   released to me is the case manager at MetLife

19   would have verified for me that they sent the

20   letter of denial to Terry on April twenty-fifth,

21   2002.

22   Q.      Then how do you interpret the item number 1

23   that says "Fax to Sara most recent denial letter

24   dated around 4/26/02.

SARA ZOBEL

1    A.    I don't know what, I don't remember those

2    notes, what that was written for.

3    Q.    When, if at all, did it come to your

4    attention, and if it didn't you can tell me that

5    too, that Ms. Jenkins has been diagnosed with

6    sickle cell anemia?

7    A.    During the 2002 time frame?

8    Q.    At any time.

9    A.    I didn't find out about it until this case

10    came up.

11    Q.    You meaning the charge in litigation?

12    A.    Correct.

13    Q.    Going back to Zobel-9, your May seventh

14    letter, it states in there that you're writing to

15    Ms. Jenkins that if she doesn't return to work,

16    you're telling her that she must return to work,

17    correct, if a doctor's work release is not

18    received by May fourteenth?

19            MS. PONTOSKI:    Object to the form

20        of the question.

21    BY MS. LOCKE:

22    Q.    That's a little bit confusing or

23    confusingly worded.    I'll ask another question.

24            This letter that's marked Zobel

SARA ZOBEL

```
1    Number 9 is telling Ms. Jenkins that she has to
2    either return to work or provide a doctor's note
3    by May fourteenth, 2002; correct?
4               MS. PONTOSKI:   Object to the form
5          of the question.  It's compound, and what
6          does she have to do by May fourteenth,
7          2002, and the document speaks for itself.
8    BY MS. LOCKE:
9    Q.     You can answer, Ms. Zobel.
10   A.     Correct.
11   Q.     The date of May thirteenth, 2002, where did
12   you come up with that date?
13   A.     I don't remember.
14   Q.     Why did you write in this letter that Ms.
15   Jenkins had to return to work by May thirteenth,
16   2002?
17   A.     I don't remember when that date was chosen.
18   Q.     But why did you send her a letter of that
19   substance?
20   A.     I sent her a letter requesting her to
21   return to work because she had been denied through
22   MetLife and she wasn't in the office.
23   Q.     Do you know where Ms. Jenkins was from May
24   seventh through May thirty-first, 2002?
```

SARA ZOBEL

```
 1              MS. PONTOSKI:  Object to the form of
 2          the question, and are you asking for her
 3          knowledge now or her knowledge back in
 4          2002?
 5   BY MS. LOCKE:
 6   Q.      Now.
 7   A.      Now, as I understand it, I believe there
 8   was a hospital stay, but that's now.  Around that
 9   time frame --
10   Q.      How did you find that information out, and
11   if it's from your lawyer, you don't have to --
12   A.      In the course of this investigation.
13   Q.      Did you learn that Ms. Jenkins had a severe
14   attack of sickle cell anemia that landed her in
15   the hospital from May seventh through May
16   thirty-first, 2002?
17              MS. PONTOSKI:  Again I'm going to
18          object to the form of the question.  What
19          time period are you asking about?
20   BY MS. LOCKE:
21   Q.      At any time.
22   A.      As a result of the investigation, yes.
23   Q.      Do you agree that since Ms. Jenkins was in
24   the hospital on May thirteenth, 2002, she was not
```

SARA ZOBEL

1   able to return to work?

2          MS. PONTOSKI:  Objection to the form

3       of the question.  You're asking the witness

4       to speculate.

5          THE WITNESS:  And I'm answering in

6       the present time.

7   BY MS. LOCKE:

8   Q.    Yes.

9   A.    I had no idea she was in the hospital.  We

10  had a --

11  Q.    Why don't you answer the question:  Do you

12  agree that if she was in the hospital, she

13  couldn't come to work?

14         MS. PONTOSKI:  Again I'm going to

15      object to the form of the question.

16  BY MS. LOCKE:

17  Q.    You verbally nodded, but you have to

18  answer.

19  A.    Yes.

20  Q.    Now, during the time period of May 2002,

21  did you receive any calls from anyone on behalf of

22  Ms. Terry Jenkins?

23  A.    I do not remember receiving any.

24  Q.    Have you ever heard the name of Gregory

SARA ZOBEL

1    Scutter?

2              MS. PONTOSKI:  Object to the form of

3         the question.  At what time period?

4    BY MS. LOCKE:

5    Q.       At any time from birth until now, have you

6    ever heard the name of Gregory Scutter?

7    A        Only as a result of this investigation.

8    Q.       Do you know whether or not -- go ahead.

9    A.       I only remember as a result of this

10   investigation.

11   Q.       You only remember?

12   A.       Yes.

13   Q.       During May of 2002, what was the system for

14   answering your telephone; was there a specific

15   person that answered your telephone if you were

16   not there?

17   A.       There was not one person, there was no

18   receptionist.  There were two HR representatives

19   and then other generalists.  We each took

20   responsibility for answering the phones if they

21   rang when you were not in the office.

22   Q.       So who were the people that could have

23   answered your phone?

24   A.       Besides myself, primary responsibility

SARA ZOBEL

1   would have been someone sitting at our

2   receptionist desk.   Backup responsibility would

3   have fallen onto the HR representatives.   There

4   were two.

5   Q.      I'm sorry, what are their names?

6   A.      Whose name, the receptionist and --

7   Q.      Both.

8   A.      One of the HR representatives names was

9   Christina Pannucio.

10  Q.      Can you spell that?

11  A.      It may not be correct, P-A-N-N-U-C-I-O.

12  I don't remember who the other HR rep was at that

13  time in the office.   Based on this investigation,

14  I can tell you I remember who the receptionist

15  was.

16  Q.      Okay.

17  A.      I believe that was Adrienne Wimbush, she

18  was not a permanent employee.

19  Q.      Was she from a temp service?

20  A.      She wasn't from a temp service.   Citigroup

21  sponsored a special program to give inner city

22  individuals an opportunity to experience working

23  in a corporate environment, so they ran on a

24  semester basis.

SARA ZOBEL

1   Q.      And Ms. Wimbush was from that program?

2   A.      Correct.

3   Q.      Was she a high school student?

4   A.      No.

5   Q.      Did she work there the spring semester of

6   2002?

7   A.      I don't remember the extent of her stay,

8   but it would have been, you know, for a certain

9   period, probably a few months, that's how the

10  program was designed to run.

11  Q.      Can you tell me again the name of that

12  program?

13  A.      I think the official program was called

14  "Wildcat," W-I-L-D-C-A-T, and it no longer exists.

15  Q.      Do you know who was in charge of that

16  program at Citigroup?

17  A.      No.

18  Q.      And you said it was community based.  I'm

19  sorry, you didn't say that, you said it was giving

20  inner city --

21  A.      From what I knew of the program, it was an

22  opportunity for individuals in the community who

23  may not have been presented with an opportunity to

24  experience working in a corporate environment.

SARA ZOBEL

```
1    handwritten log or a computerized log?

2    A.      There wasn't one process.

3    Q.      How did it work?

4    A.      I could have gotten an e-mail, so and so

5    called.  Anyone who took the message when I was

6    out of the office could have given me the message

7    in passing or they could have written it down and

8    left me a note.

9    Q.      It is possible that you received a

10   telephone call from Gregory Scutter in May of

11   2002?

12              MS. PONTOSKI:  Object to the form of

13         the question.  You're asking for

14         speculation.

15              THE WITNESS:  That I received a phone

16         call?

17   BY MS. LOCKE:

18   Q.      That a phone call -- not that you

19   personally spoke to him but that a phone call was

20   taken for you from him?

21              MS. PONTOSKI:  Again I object to the

22         form of the question.  She has no knowledge

23         of a phone call that was taken for her.

24              THE WITNESS:  It's possible.
```

SARA ZOBEL

1    Q.      Did you ever see a report made by Dr.

2    Rogers on behalf of MetLife in relation to Terry

3    Jenkins?

4    A.      No.

5    Q.      Do you know where Mr. William Carpenter is

6    working now?

7    A.      I don't remember the name of the company.

8    Q.      Do you know why he left Citibank?

9    A.      I can make an assumption, but I don't know.

10   Q.      Getting back to Ms. Jenkins's termination,

11   who made the decision to terminate her employment?

12   Let me phrase it in a different way.

13                  MS. LOCKE:  Mark this as Zobel-10.

14                        - - -

15                  (Whereupon, a letter dated May 15,

16          2002 from Sara Zobel to 10 Nicole Court-

17          Hawks West was marked for identification as

18          Exhibit Zobel-10.)

19                        - - -

20   BY MS. LOCKE:

21   Q.      Let me show this to you.  Please take a

22   minute to look at Zobel-10, please.

23   A.      Okay.

24   Q.      Is this a letter that bears your signature

SARA ZOBEL

```
1    dated May fifteenth, 2002?

2    A.      It has my signature, yes.

3    Q.      And do you know why it doesn't have a name

4    on the main line?

5    A.      No.  I assume you mean the name line above

6    10 Nicole?

7    Q.      Right.  Do you know why?

8    A.      No.

9    Q.      The first sentence of this letter, and even

10   though it just says Terry, I think we can agree

11   that it's for Terry Jenkins.  Do you agree to

12   that?

13   A.      I agree to that.

14   Q.      It says, "This letter is to inform you that

15   Citigroup has terminated your employment."  Did

16   anyone instruct you to send Ms. Jenkins a letter

17   terminating her employment?

18              MS. PONTOSKI:  Objection to the form

19         of the question.

20              THE WITNESS:  I wouldn't have

21         received instructions, there would have

22         been dialogue and discussion with my

23         manager.

24   BY MS. LOCKE:
```

SARA ZOBEL

```
1    Q.      Who was?

2    A.      Kathy Negron, who I mentioned earlier.

3    Q.      What do you recall of that conversation?

4    A.      I don't remember.

5    Q.      Would it be fair to say Ms. Jenkins was

6    terminated because MetLife did not approve her

7    disability benefits and she did not return to

8    work?

9              MS. PONTOSKI:  Object to the form

10             of the question.

11             THE WITNESS:  This letter stemmed

12             from her absence in the office and that she

13             had not been in contact with myself or with

14             Bill Carpenter at the time.

15   BY MS. LOCKE:

16   Q.      You're not answering my question.

17             MS. LOCKE:  Can you read back the

18             question?

19                 - - -

20             (Whereupon, the court reporter read

21             the following question:

22             "Q.      Would it be fair to say Ms. Jenkins

23             was terminated because MetLife did not

24             approve her disability benefits and she did
```

SARA ZOBEL

1           not return to work?")

2                  - - -

3           THE WITNESS:  No.

4    BY MS. LOCKE:

5    Q.     Is it true that MetLife denied disability

6    benefits to Ms. Jenkins?

7    A.     Yes.

8    Q.     Is it also true that despite the fact that

9    Ms. Jenkins was not released by her doctor,

10   Citibank asked her to return to work?

11   A.     No.

12   Q.     To your knowledge, was Ms. Jenkins released

13   by her physician to return to work in May of 2002?

14   A.     I don't know.

15   Q.     Didn't you just clarify that you have since

16   found out that she was in the hospital in May

17   2002?

18   A.     Since I have found out, yes.

19   Q.     Did anyone in your organization receive a

20   note from Ms. Jenkins saying that she was released

21   to return to work in May of 2002?

22           MS. PONTOSKI:  Objection to the form

23       of the question.  It calls for the witness

24       to speculate.

SARA ZOBEL

```
1   BY MS. LOCKE:

2   Q.      You can answer.

3   A.      Not that I am aware of.

4   Q.      Are you aware of the return date Ms.

5   Jenkins's physician gave on a leave slip submitted

6   to Ms. Bianchi for Ms. Jenkins to return to work?

7   A.      In May of 2002?

8   Q.      April or May 2002, that general time frame.

9   A.      I'm aware of no return-to-work date.

10  Q.      Prior to terminating Ms. Jenkins, did you

11  call Ms. Bianchi and the people at MetLife to find

12  out whether they had in their possession a

13  physician's leave slip giving a return to work

14  date for Ms. Jenkins in June 2002, some dated

15  2002.

16  A.      I don't recall.

17  Q.      Did you in any way ask the people at

18  MetLife if Ms. Jenkins's physician had provided a

19  leave slip with a return date to work for her?

20  A.      I don't remember.

21  Q.      Were you aware that Ms. Jenkins was

22  communicating with MetLife with regard to her

23  absence from work?

24          MS. PONTOSKI:  Object to the form of
```

SARA ZOBEL

1          the question.  During what time period?

2    BY MS. LOCKE:

3    Q.      First let's start with at all.

4    A.      She would have had to.  They would have

5    never had a record of any of her information if

6    there wasn't dialogue back and forth between Terry

7    and MetLife.

8               Do you mind if we take a break?

9               MS. LOCKE:  Not at all.

10                      -  -  -

11              (Whereupon, a short back was taken.)

12                      -  -  -

13   BY MS. LOCKE:

14   Q.      Getting back to Zobel-10, the May fifteenth

15   letter, it states that the termination of Ms.

16   Jenkins will be documented as a job abandonment

17   effective May fifteenth, 2002; correct?

18   A.      Yes.

19   Q.      If MetLife had approved Ms. Jenkins for

20   disability, she would not have been terminated for

21   job abandonment; correct?

22               MS. PONTOSKI:  Object to the form of

23          the question.

24   BY MS. LOCKE:

# citigroup

**corporate & investment bank**

Salomon Smith Barney & Citibank

EXHIBIT

Zobel –1

9T 5/54/06

**EMPLOYEE HANDBOOK**

2003

FOR U.S. EMPLOYEES

WHO ARE MANAGED BY

THE CITIGROUP CORPORATE &

INVESTMENT BANK

CB00381
CONFIDENTIAL

# Table of Contents

*Letter from John Donnelly* ...............................2

*Introduction* .................................................3

## Section 1—Employment Policies ...............4
Principles of Employment ...............................4
Equal Employment Opportunity Policy ...............5
Employment At-Will ......................................5
Global Diversity ...........................................6
Open Door Policy .........................................6
Reasonable Accommodations for Disabled Employees ....6
Sexual Harassment/Unlawful Discrimination Policy ...........7
Electronic Communications Policy ...................8
Employment of Relatives ..............................9
Consensual Relationships .............................9

## Section 2—Employment Practices ...........10
Personal Code of Conduct ............................10
Use of Firm Property ...................................10
Safeguarding Firm Property ..........................10
Safe Workplace ..........................................11
Business Casual Dress Policy ........................11
Solicitation ...............................................11
Smoking ..................................................12
Substance Abuse Policy ..............................12
Inquiries from Outside the Firm ....................12
Inquiries from Within the Firm .....................13
Regulatory Requirements ............................13

## Section 3—Pay Policies ........................16
Compensation Payments ..............................16
Employment Classifications ..........................16
Shift Differential .......................................17
Overtime Payments and Meals ......................17
Bonus/Incentive Compensation .....................18

## Section 4—Time Away ..........................19
Vacation ..................................................19
Personal Days ...........................................20
Sick Days .................................................20
Absence and Lateness .................................21

Holidays...................................................21
Other Leaves.............................................22
    Funeral Leave .....................................22
    Jury Duty ...........................................22
    Military Leave .....................................22
    Voting ...............................................22
    Personal Leave of Absence.....................22
Family and Medical Leave Act Policy................22
Disability Leave..........................................23
    Short-term Disability ............................23
    Long-term Disability .............................24
    Pregnancy Leave .................................25
    Adoption Leave ...................................25

## Section 5—Working Together ................27
When a Problem Arises .................................27
Dispute Resolution Procedure .......................27
Employee Hotline ......................................28
Employee Assistance Program .......................28
Lifeworks ................................................29
Primeline—Ethics Hotline ...........................29
Tuition Reimbursement ...............................29

## Section 6—Leaving the Corporate & Investment Bank ................................31
Voluntary Separation ..................................31
    Resigning ..........................................31
    Retirement ........................................31
Involuntary Separation ................................31
    Workforce Reduction ............................31
    Other Dismissals .................................32
Exit Interview ...........................................32
References ...............................................32
Re-Employment .........................................32

## Appendix ..........................................33
A. Arbitration Policy ...................................33
B. Family and Medical Leave Act Policy ............38
C. Separation Pay Plan ................................42

CB00383
CONFIDENTIAL

## OTHER LEAVES

### Funeral Leave

Upon the death of an immediate family member, you may take up to five consecutive days of paid time-off. An "immediate family member" is defined as a parent, spouse, domestic partner, child, sibling, in-law, grandparent or grandchild. You may take one day off for the death of an extended family member. Should additional paid leave be necessary, personal days may be used and unpaid days may be granted at the discretion of your Manager.

### Jury Duty

Time off from work with pay up to a period of six weeks will be granted if you have been called to jury duty (grand or trial) or have been subpoenaed to serve as a witness. However, the Firm may request a postponement of your jury duty should business needs so dictate. It is essential that you notify your Manager as soon as you have been asked to serve on a jury so that arrangements can be made to cover your workload while you are away. If you need a postponement as dictated by business needs, your Manager or Human Resources Generalist will write/authorize a letter requesting a new date. Proof of court attendance should be submitted to your Manager. You may keep any amounts paid by the court for jury duty service. When court is not in session or your attendance is not required, employees must report to work.

### Military Leave

The Firm provides a six-month paid military leave for service in the uniformed services. Salaried employees will receive their regular base salary offset by any military pay received. Commissioned employees will be paid based on the same payment schedule as Short-term Disability for up to six months. (See Short Term Disability page 24.) Employees should speak with their Human Resources Generalist to understand the impact military leave will have on the various benefit plans. Prior to leave, employees must provide advance verbal or written notice of military service if practical.

At the end of military service, employees must return to work within the applicable time period.

### Voting

Generally, you are expected to vote before or after work hours on Election Day. However, for special circumstances you may request time off during the workday to vote. Time off during the workday requires preapproval by your Manager. Since state laws may differ, please check with your Human Resources Generalist.

### Personal Leave of Absence

Personal leaves are not covered under the Family and Medical Leave Policy; they are without pay; and they are only granted to full-time and flex-time employees who have an extreme personal circumstances, making it impossible for them to work for some period of time.

All personal leaves are without pay and the employee is required to pay the entire premium for their benefits while on leave. Personal leaves are granted at the Manager's sole discretion and based on business needs.

Reinstatement cannot be guaranteed to employees returning from personal leaves, no matter how short the leave.

## FAMILY AND MEDICAL LEAVE ACT POLICY

The Corporate & Investment Bank recognizes that events like pregnancy, adoption, birth of your child, or your or your family member's serious health condition may require you to take time away from your job. The following policies are in place to help you meet your special needs for time off. All leaves described below are provided pursuant to the Citigroup Corporate & Investment Bank's Family and Medical Leave Act Policy ("FMLA Policy") and may be completely or partially with pay. Under the FMLA Policy, an eligible employee may take up to a total of 13 weeks leave

CB00404
CONFIDENTIAL

within a rolling 52-week period for any of the following reasons or combination of reasons:

- For an employee's own serious health condition, including pregnancy or injuries covered under Workers' Compensation, where the employee is unable to perform his/her job (Employee Medical Leave or "EML")
- To care for the employee's child after birth, adoption or foster care placement (Child Care Leave or "CCL")
- To care for the employee's family member who has a serious health condition (Family Medical Leave "FML")

All of the above-described leaves are provided pursuant to The Corporate & Investment Bank's FMLA Policy. In other words, any above described leave will count towards the 13 weeks of leave permitted under the Firm's FMLA policy, except where local law differs.

Please see Appendix B for the full Corporate & Investment Bank Family Medical Leave Act Policy.

## DISABILITY LEAVE

One of the most important benefits the Corporate & Investment Bank offers to full-time and flex-time benefits-eligible employees is compensation during extended absences due to a serious health condition, illness or injury. The extent of these benefits varies according to how long you have been with the Firm. The Corporate & Investment Bank has two disability programs: Short-term Disability and Long-term Disability. Each has its own guidelines and its own coverage limitations. All leaves under the Short-term Disability and the Long-term Disability programs are granted pursuant to the Corporate & Investment Bank's FMLA Policy.

## Short-term Disability

The Corporate & Investment Bank offers a Short-term Disability (STD) Plan which replaces all or a portion of your income during the first 13 weeks of disability. You may be considered disabled once you have been absent from work for six consecutive business days due to a serious health condition, illness or injury. If you become disabled, your Manager should submit an Application for Medical Leave to the Group Insurance Department. Under the STD policy, you would then be placed on a medical leave of absence upon receiving proper approval. The effective date of your STD leave will be your first day of absence.

The following schedules detail the maximum disability benefits available during a rolling 52-week period for either full-time and flex-time benefits-eligible employees or Financial Consultants, Financial Consultant Associates, Investment Associates and Account Executives.

For salaried employees, STD benefits, which are entirely firm-paid, continue your base salary for up to 13 weeks for an approved disability. The number of weeks at 100% of base salary will depend on your length of service with Citigroup. If you were given credit for past service (either you were rehired or worked in the past for what is now a Citigroup Firm), your length of service will be based on your "benefits service date." Former Citibank employees who are paid at the 60% rate. may draw down days from their frozen sick bank to reach 100% of base salary. Each sick bank day used will bring the employee to 100% of base salary for one day. Sick bank days will not be prorated.

**CB00405
CONFIDENTIAL**

**STD schedule of benefits beginning January 1, 2002**

| Years of service | Weeks at 100% of base salary | Weeks at 60% of base salary | Total weeks of 100%/60% base salary |
|---|---|---|---|
| Less than 1 month | 0 | 0 | 0 |
| 1 month to less than 1 year | 1 | 12 | 13 |
| 1 year to less than 2 years | 4 | 9 | 13 |
| 2 year to less than 3 years | 6 | 7 | 13 |
| 3 years to less than 4 years | 8 | 5 | 13 |
| 4 years to less than 5 years | 10 | 3 | 13 |
| 5 or more years | 13 | 0 | 13 |

For commission-paid employees, Financial Consultants, Financial Consultant Associates. Investment Associates and Account Executives, the following schedule of benefits apply:

| Years of service | Minimum benefit (% of Total Compensation) | Plus additional benefit | Potential maximum benefit (% of Total Compensation) |
|---|---|---|---|
| 1 month to less than 3 years | 60% | Commissions | 100% |
| 3 years to less than 7 years | 70% | Commissions | 100% |
| 7 or more years | 80% | Commissions | 100% |

Upon return from leave or your approval for LTD. the FC Compensation area will review your compensation paid while on leave. If the split of actual fees or commissions paid to you from your book of business, while you were out on a disability leave exceeds 100% of your total compensation paid (maximum benefit), the difference will be paid to you.

## Long-term Disability

Long-term disability ("LTD") applies to employees who have been on short-term disability for more than 13 consecutive weeks. Similarly, if you are on short-term disability for less than 13 consecutive weeks, return to work for less than 30 days and then become disabled again by the same condition. you would be eligible for LTD as well, provided you have been on short-term disability for a total of 13 weeks.

Long-term disability coverage is offered to continue 60% of your total compensation up to $500,000, when an approved disability continues for more than 13 weeks.

**LTD coverage beginning January 1, 2002**

If your total compensation is:

| Less than $50,000 | ■ The Firm provides LTD coverage at no cost to you<br>■ Benefits are taxable |
|---|---|
| $50,001 up to $500,000 | ■ You'll pay for coverage with after-tax dollars<br>■ Your benefit is not taxable<br>■ Maximum monthly benefit equals $25,000 tax-free |

You may be able to receive LTD benefits if you elected Long-term Disability coverage as part of your benefits elections.

Benefits begin on the 91st consecutive day of disability and are offset by any disability income that you are entitled to through other sources. such as statutory disability benefits and Social Security disability benefits.

If you did not elect Long-term Disability coverage. you are eligible to apply for statutory disability benefits, where applicable, and/or Social Security disability benefits. Former Citibank employees, who do not elect Long-term Disability coverage, may continue to receive pay by drawing down days from their frozen sick bank for up to a maximum of 52 weeks from their first day out on an approved leave.

CB00406
CONFIDENTIAL

Please keep in mind that all STD and LTD leaves are provided pursuant to the Corporate & Investment Bank's Family and Medical Leave Act Policy. The amount of STD leave you have taken will count toward the length of your Family and Medical Leave entitlement of 13 weeks within a rolling 52-week period.

If you do not return to work at the conclusion of your 13-week leave and are not eligible for LTD, you will be subject to termination unless an extension is requested and approved. If your medical disability prevents you from returning to work for more than 12 months from when you first went out on STD, your employment will be terminated.

For further information regarding either disability plan, you should contact the Group Insurance Department or your Human Resources Generalist.

### Pregnancy Leave

All full-time and flex-time female benefits-eligible employees who have been employed for at least one month are eligible for 13 weeks of pregnancy disability leave with pay.

For salaried employees, the following schedule of benefits apply:

- If employed for more than one month but less than 1 year, you are entitled to 1 week @ 100% of base salary and 12 weeks @ 60% of base salary from your first day out.
- If employed for one year or more, you are entitled to 13 weeks @ 100% of base salary from your first day out.

For commission-paid employees, Financial Consultants, Financial Consultant Associates, Investment Associates and Account Executives, the following schedule of benefits apply:

- If employed for more than one month but less than one year, you are entitled to 70% of your total compensation for 13 weeks.

- If employed for one year or more, you are entitled to 80% of your total compensation for 13 weeks.

Upon return from leave or your approval for LTD, the FC Compensation area will review your compensation paid while on leave. If the split of actual fees or commissions paid to you from your book of business, while you were out on a pregnancy leave exceeds 100% of your total compensation paid (maximum benefit), the difference will be paid to you.

All pregnancy leaves are provided pursuant to the Corporate & Investment Bank's Family and Medical Leave Act Policy. In other words, your pregnancy leave will count toward the 13-week leave permitted under the Corporate & Investment Bank's Family and Medical Leave Act Policy. A pregnancy leave begins when you are medically certified as unable to work due to your pregnancy and continues for a total of 13 weeks. For employees who have been employed for more than one year, should you become disabled with a condition unrelated to a previous pregnancy or childbirth within 52 weeks of starting your pregnancy leave, you would be eligible for an additional period of paid short-term disability. During this 13-week period, you are guaranteed your current position or a comparable job upon your return unless you would not have continued to be employed, regardless of the leave. If you do not return to work at the conclusion of your 13-week leave, you will be subject to termination unless an extension is requested and approved.

For more information on the Pregnancy Leave Policy, you should contact the Group Insurance Department or your Human Resources Generalist.

### Adoption Leave

The Firm provides for up to eight weeks of paid adoption leave to salaried employees who have been employed for at least one month and who are the adopted child's primary care giver. The adoption leave may be paid for all or part of the eight weeks as described below:

CB00407
CONFIDENTIAL

**CITIBANK** 

**SALOMON SMITH BARNEY**

Members of citigroup

May 7th, 2002

Terry Jenkins

New Castle, DE 19720

Redacted
Pursuant to Administrative
Procedures Governing ECF

Dear Terry:

On April 25th, 2002 a letter from MetLife was mailed to your attention at the above address. This letter stated that your disability claim, # 590201098659 was appealed and the decision of denial upheld.

We are requesting you return to work by Monday, May 13th, 2002. Immediately upon your return please send a Doctor's notice releasing your return to work to:

Salomon Smith Barney
Medical Center
333 W 34th Street
1st Floor
New York, NY 10001

If you do not return to work on the above date, and a Doctors' work release note is not received by the Medical Center by May 14th, 2002, we will considered you to have resigned from your position with Citibank.

Should you have any questions, please feel free to contact me at (212) 615-9383.

Sincerely,

Sara Zobel
Assistant Vice President
Human Resources

EXHIBIT

Zobel-9
WP 5/24/06

cc: William Carpenter

SALOMON SMITH BARNEY, INC. 333 West 34th Street, 1st Floor, New York, NY 10001



**CITIBANK◆** | **SALOMON SMITH BARNEY**

Members of citigroup

May 15, 2002

███████████                                    Redacted
                                        Pursuant to Administrative
New Castle, DE   19720                   Procedures Governing ECF

Dear Terry:

This letter is to inform you that Citigroup has terminated your employment. This termination will be documented as job abandonment effective May 13th, 2002.

Please review the enclosed documentation highlighting your benefit coverage. Should you have any additional questions, I may be reached at (212) 615-9383.

Sincerely,

Sara Zobel
Assistant Vice President
Human Resources

cc: William Carpenter

EXHIBIT
Zobel - 10
JFP 5/24/06



**Synchrony Integrated Disability Services**
P.O. Box 150448
Hartford, CT 06115-0448



# FAX     050702

**Number of Pages: 2**

| To: Sara Sobal | From:  Paula Bianchi |
|---|---|
| Contact: Citibank | Claim: 590201098569 |
| Re: Terry Jenkins | SSN: █████  *Redacted Pursuant to Administrative Procedures Governing ECF* |
| Tel: 302-894-6035 | Tel:  860-682-6910 |
| Fax: 212-615-9379 | Fax:  860-682-6969 |

**Comments:**

Per your request.



EXHIBIT

Zobel-14



Thomas Tawyer
04/26/2002 12:03 PM

To:      LeaveManagementGroup@AFCC.com
cc:      Patricia.D.Stewart@Citi.com
Subject: STD Appeal Decision

## STD/LTD/FMLA DENIAL/APPEAL NOTIFICATION
## FOR CITIGROUP

FROM:

Synchrony Integrated Disability Services

RE: Terry Jenkins
SS#:

Redacted
Pursuant to Administrative
Procedures Governing ECF

Please be advised that STD further benefits for your above named employee have been denied
as of January 22, 2002 for the following reason(s) checked below:

|   | |
|---|---|
|   | The employee does not meet the eligibility requirements. |
| x | Medical documentation in our claim file indicates that the employee is no longer disabled from his/her occupation. Decision upheld on appeal 4/26/02. |
|   | Medical documentation in our claim file indicates that the employee is not disabled from any occupation.  (LTD only) |
|   | The employee has not submitted requested medical documentation to substantiate a claim for continued disability benefits. |
|   | The employee is no longer under the care of a physician or competent medical provider. |
|   | The employee has received the maximum duration of benefits that he/she is eligible for from t plan. |
|   | The employee has a pre-existing condition. (LTD only) |
|   | (Leave Management only): An appeal has been received on |

CB00277

** TOTAL PAGE.

```
15=============================================================================
=== Date: 05/07/2002      Corporate & Investment Bank              =======BRWSSBS.
=== HRLINK To:   SBS - HOME/SPOUSE/EMERGENCY DATA                  Time: 10.46.5
                                                                  User: P6506
 | SS#/EE Name: ████████████ JENKINS,TERRY B
 | Dept #/Name: 12357C GL 5                                       Org/Co.: CB70
 | Original/Latest Hire: 07/01/1996   07/01/1996      Status: LOA W/P 01/24/20
 |------------------------------------------------------------------------------
 | HOME ---- Address: ███████████████████
 |                  :
 |     City, State Zip: NEW CASTLE, DE 19720
 |           Country: US - UNITED STATES OF AMERICA
 |     Home Telephone: ████████████
 |        Citizenship: US UNITED STATES OF AMERICA
 |------------------------------------------------------------------------------
 |-------* Spousal Information *------- |--------* Emergency Contact *------
 | Name:                               | Name: JOHNNYMAE JENKINS
 | Soc.Sec.No.:      -   -             | Relationship: MOTHER
 | Birth Date:                         |    Telephone: ██████████████
 |==============================================================================
 | PF01-EmpData1  | PF03-Job/Off  | PF05-Salary  | PF07-HomeAdr | PF09-Brow
 | PF02-EmpData2  | PF04-Dept Org | PF06-FC Misc.| PF08-Co.Help | PF10-Sear
 ===============================================================================
```

Redacted
Pursuant to Administrative
Procedures Governing ECF

Date: 5/7/ 2 Time: 10:47:00 AM