# ADMINISTRATIVE SERVICES AGREEMENT

# SALARY CONTINUANCE ADVICE

# PARTIES

# METROPOLITAN LIFE INSURANCE COMPANY

# CITIGROUP INC.
## as Program Sponsor

**Disability Benefits**   Metlife / Synchrony

CB00129

# TABLE OF CONTENTS

| | | | PAGE |
|---|---|---|---|
| **Section 1:  DEFINITIONS** | | | |
| A. | General Definitions | | 2 |
| | 1. | Agreement | 2 |
| | 2. | Claim | 2 |
| | 3. | Confidential Information | 2 |
| | 4. | Contract Period | 2 |
| | 5. | Covenant | 2 |
| | 6. | Customer | 2 |
| | 7. | ERISA | 2 |
| | 8. | MetLife | 2 |
| | 9. | Participant | 2 |
| | 10. | Party(ies) | 2 |
| | 11. | Program(s) | 2 |
| | 12. | Program Benefits | 2 |
| | 13. | Represents | 3 |
| | 14. | Self Funded | 3 |
| B. | Specific Definitions | | 3 |
| | | | |
| **Section 2:  CONSULTING, ACTUARIAL AND TECHNICAL SERVICES** | | | |
| A. | Advisory Services | | 4 |
| B. | Standard Administrative Forms | | 4 |
| C. | Standard Administrative Manuals | | 4 |
| D. | Escheat Laws | | 4 |
| E. | Customer Obligations | | 4 |
| | | | |
| **Section 3:  RESPONSIBILITIES** | | | 6 |
| | | | |
| **Section 4:  CLAIM PROCESSING SERVICES** | | | |
| Disability Benefits | | | 7 |
| | 1. | Delegation of Authority | 7 |
| | 2. | Initial Claim Evaluation | 7 |
| | 3. | Determination of Benefits | 7 |
| | 4. | Advice on Verification of Coverage and Claim Submission | 7 |
| | 5. | Standard Claim Forms | 7 |
| | 6. | Advice on Applying for Social Security Disability Benefits | 7 |
| | 7. | Reduction of Benefits Provisions | 7 |
| | 8. | Rehabilitation Services | 7 |
| | 9. | Customer Service | 7 |
| | 10. | Quality Management Review | 7 |
| | | | |
| **Section 5:  REPORT SERVICES** | | | |
| A. | Reports Furnished at No Additional Charge | | 8 |
| B. | Reports Furnished at Additional Charge | | 8 |
| C. | Other Reports | | 8 |
| | | | |
| **Section 6:  ADDITIONAL SERVICES** | | | 9 |
| | | | |
| **Section 7:    SERVICE FEES** | | | |
| A. | Service Fees | | 10 |
| B. | Monthly Service Fee | | 10 |

CB00130

C. Additional Fees ........................................................................................ 10
D. Service Fee Adjustment ............................................................................ 11
E. Late Payment Charge ................................................................................ 11
    1.    Assessment of Late Payment Charge ............................................... 11
    2.    Change of Late Payment Charge Formula .......................................... 11
    3.    Waiver of Late Payment Charge ........................................................ 11

**Section 8: SUMMARY PROGRAM DESCRIPTION**
A. Customer to Furnish Copy to MetLife ......................................................... 12
B. Customer to Furnish Advance Notice of Program Changes .......................... 12
C. Customer Liability for Program Benefits .................................................... 12

**Section 9: CONFIDENTIAL INFORMATION AND USE OF NAMES, SERVICE MARKS AND TRADEMARKS**
A. Confidential Information ............................................................................ 13
B. Identification of Confidential Information .................................................. 13
C. Non-Disclosure of Confidential Information .............................................. 13
D. Examiners and Confidential Information .................................................... 13
E. Limitation on Non-Disclosure Obligation .................................................. 13
F. Individually Identifiable Participant Information ......................................... 13
G. Unauthorized Disclosure of Confidential Information ................................. 13
H. No Use of Other Party's Name, Service Marks or Trademarks .................... 14
I. Name of Program ..................................................................................... 14
J. Customer's Approval of Material Used by MetLife ...................................... 14
K. MetLife's Approval of Material Used by Customer ...................................... 14

**Section 10: EXAMINATIONS**
A. Examination of MetLife ............................................................................ 15
B. Charges for Examination of MetLife .......................................................... 15
C. Confidentiality Agreement ........................................................................ 15

**Section 11: TAXES**
A. Customer Obligation to Pay Taxes ............................................................ 16
B. Payment Due Date ................................................................................... 16
C. Determination That Taxes Were Not Valid ................................................ 16
D. Penalties ................................................................................................. 16

**Section 12: PROGRAM BENEFITS LITIGATION**
A. Definition of Program Benefits Litigation .................................................. 17
B. Customer Liability for Program Benefits .................................................... 17
C. If Program Benefits Litigation is Brought Against MetLife .......................... 17
D. If Program Benefits Litigation is Brought Against Customer and/or the Program .................. 18
E. If Program Benefits Litigation is Brought Against MetLife and Customer ................................... 18

CB00131

**Section 13:  INDEMNIFICATION OF CUSTOMER**

   A.  Definitions........................................................................................................... 19
       1.   Damages............................................................................................... 19
       2.   Non-Party Claim ................................................................................. 19
   B.  Indemnification by MetLife.............................................................................. 19
   C.  Discretion to Resolve Non-Party Claim ......................................................... 19
   D.  No Rights Afforded to Third Parties................................................................ 19

**Section 14:  INDEMNIFICATION OF METLIFE**

   A.  Definitions ......................................................................................................... 20
       1.   Damages............................................................................................... 20
       2.   Non-Party Claim.................................................................................. 20
   B.  Indemnification by Customer........................................................................... 20
   C.  Discretion to Resolve Non-Party Claim ......................................................... 20
   D.  No Rights Afforded to Third Parties................................................................ 20

**Section 15:  TERM/TERMINATION OF THIS AGREEMENT**

   A.  Continuity of Agreement .................................................................................. 21
   B.  Termination of the Agreement.......................................................................... 21
       Date of Termination ................................................................................... 21

**Section 16:  GENERAL PROVISIONS**

   A.  Agreement Counterparts .................................................................................. 22
   B.  Certification and Licensing .............................................................................. 22
   C.  Choice of Law.................................................................................................... 22
   D.  Compliance........................................................................................................ 22
   E.  Cooperation........................................................................................................ 22
   F.  Entire Contract .................................................................................................. 22
   G.  Independent Contractor Status ......................................................................... 22
   H.  Liability Coverage ............................................................................................ 22
   I.  Limitation on Actions ...................................................................................... 22
   J.  Modification of Agreement............................................................................... 22
   K.  Notices................................................................................................................ 23
   L.  Survival.............................................................................................................. 23
   M.  Waivers............................................................................................................... 23
   N.  Headings ............................................................................................................ 23
   O.  Severability ....................................................................................................... 23

**ADMINISTRATIVE SERVICES AGREEMENT EXECUTION PAGE** ....................................... 24

**APPENDICES**

   **MONTHLY SERVICE FEE** ............................................................................... A-2
   **SUMMARY PROGRAM DESCRIPTION** ......................................................... A-3
   **EXAMINER'S CONFIDENTIALITY AGREEMENT**........................................ A-4

CB00132

# ADMINISTRATIVE SERVICES AGREEMENT

This agreement is effective January 1, 2002 and is entered into by and among:

**Metropolitan Life Insurance Company**
One Madison Avenue
New York, New York 10010

**Citigroup Inc.,** as Program Sponsor
1 Court Square, 15th Floor
Long Island City, New York, 11120

## RECITALS

1. Citigroup Inc. has established a salary continuation program to provide certain benefits for employees who are absent due to sickness or injury.

2. Citigroup Inc. wants to contract with Metropolitan Life Insurance Company to render certain services necessary in the administration of the Salary Continuation Program and Metropolitan Life Insurance Company is willing to provide these services as described in this Agreement.

CB00133

## Section 1:                                   DEFINITIONS

A.   **General Definitions:** For the purposes of this Agreement the following terms shall have the following meanings:

1.   **"Agreement"** means this Administrative Services Agreement and all Appendices annexed to this Administrative Services Agreement. All Appendices are deemed to be incorporated by reference into this Agreement.

2.   **"Claim"** means a request for payment of Disability benefits.

3.   **"Confidential Information"** means statistical and other information which is identified by a Party as commercially valuable, confidential, proprietary or trade secret.

4.   **"Contract Period"** means the period beginning on January 1 of a calendar year and ending on the next following December 31. In no event will a Contract Period include any period of time beyond the date of termination of this Agreement. The **"First"** Contract Period will begin on January 1, 2002 and will end on December 31, 2002. A **"Subsequent"** Contract Period means any Contract Period following the First Contract Period.

5.   **"Covenant"** means a promise or promises by one Party to the other that the promising Party will and shall undertake to do that which is promised, in the manner described in this Agreement.

6.   **"Customer"** means Citigroup Inc., its directors, trustees, officers, Program fiduciaries, employees, agents, or committees to whom authority to act on its behalf with respect to the Program or this Agreement has been delegated (not including MetLife or its Standard Subcontractors).

7.   **"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended.

8.   **"MetLife"** means Metropolitan Life Insurance Company, its directors, officers, employees, agents, committees, subsidiaries and/or its Standard Subcontractors to whom authority to act on Metropolitan Life Insurance Company's behalf in connection with the Program or this Agreement has been delegated.

9.   **"Participant"** means a current or former employee of Citigroup Inc., who is eligible and enrolled for coverage under and subject to the Program's terms.

10.  **"Party(ies)"** means (a) signatory(ies) to this Agreement.

11.  **"Program"** means Citigroup Inc. Salary Continuation Program which Customer represents is Self-Funded, paid from the Customer's general assets and does not involve employee contribution. Citigroup Inc. represents that this program is a "payroll practice" as specified in ERISA Regulation 29 CFR Section 2510.3-1 (b) and is not an "employee welfare benefit plan" or "welfare plan" as those terms are defined by ERISA.

12.  **"Program Benefits"** means, collectively, all benefits of whatever nature available to a Participant under and subject to the terms and conditions of the Program.

CB00134

**13.**    **"Represents"** means that the Party is making a statement of fact or circumstances at the time of the execution of this Agreement with the knowledge and understanding that such statement was influential in bringing about this Agreement.

**14.**    **"Self-Funded"** means that the Program Benefits are funded by Customer with and not pursuant to any type of MetLife insurance policy.

**B.**    **Specific Definitions:** Certain terms having application only to specific provisions of this Agreement are defined in those specific provisions.

CB00135

**Section 2:    CONSULTING, ACTUARIAL AND TECHNICAL SERVICES**

A.    **Advisory Services:** MetLife will provide advice to Customer when requested to do so regarding:

    1.    Program design and revisions, including questions regarding eligibility for participation and effective dates and cessation of coverage.

    2.    Completion of standard forms required by ERISA.

    3.    Program documents including the Summary Program Description (SPD) and other material intended for distribution to Participants.

B.    **Standard Administrative Forms:** MetLife will provide Customer with standard forms which may be used for administration of the Program, including those necessary to process enrollments in the Program, designations of beneficiaries or dependents, etc. Customer will not use non-standard administrative forms without first consulting with MetLife.

C.    **Standard Administrative Manuals:** MetLife will prepare, update and provide Customer with standard manuals to assist in Program Administration.

D.    **Escheat Laws:** MetLife will prepare and file reports on behalf of the Program to comply with any escheat laws that Customer indicates may be applicable to the Program.

E.    **Customer Obligations:** Customer shall have the following obligations in addition to its other obligations under this Agreement:

    1.    **Final Authority for the Program:** Except as otherwise provided in this Agreement, Customer retains all final authority and responsibility for the Program and its operation and for compliance with any and all applicable laws and regulations relating thereto.

    2.    **Furnish Financial Information:** On MetLife's request, Customer will furnish information about its financial condition reasonably required by MetLife to enable it to determine    the ability of Customer to meet its financial obligations under this Agreement.

    3.    **Advise Participants of MetLife's Role:** Prior to the effective date of this Agreement, Customer will give Participants written notice, in a form approved by MetLife, that MetLife will be processing claims under the Program and that indicates the manner in which such claims should be filed. If, prior to the effective date of this Agreement, the benefits of the Program were insured, this written notice will also indicate that Customer has assumed liability for payment of Program Benefits.

    4.    **Furnish Information of Participant Complaints:** Customer will advise MetLife of any complaints of which Customer is aware that were lodged by Participants regarding the services provided by MetLife.

    5.    **Furnish Information to Enable MetLife to Perform its Duties:** The Customer shall provide MetLife on a timely basis with such information as to the employees' covered Program benefits and as to the employees covered under the Program as will be necessary for MetLife to perform its duties under this Agreement.

    6.    **Furnish Documentary Information:** Upon request of MetLife, the Customer will furnish to MetLife copies of all documents relating to the Program including, but not limited to, all

CB00136

communications with employees relating to the Program. The Customer will amend any such document, at the request of MetLife, if the provisions to be amended relate directly or indirectly to the rights and obligations of MetLife with respect to the Program or if the provisions are inconsistent with this Agreement.

CB00137

**Section 3:**                                    **RESPONSIBILITIES**

The parties acknowledge that in fulfilling its obligations under this program MetLife is not exercising discretion with respect to an ERISA Plan.

6

CB00138

## Section 4:          CLAIM PROCESSING SERVICES

**Disability Benefits:** With respect to disability benefits Claim processing:

1. **Delegation of Authority:** Citigroup Inc. and MetLife acknowledge that Citigroup Inc. has delegated to MetLife, and MetLife has agreed to assume, responsibility and initial discretionary authority for determining eligibility for disability benefits and for construing Program terms.

2. **Initial Claim Evaluation:** MetLife will conduct an initial evaluation of Claims to determine whether disability benefits are payable. When deemed appropriate by MetLife, Claims evaluation will include review by medical professionals including but not limited to Disability Nurse Specialists employed or retained by MetLife.

3. **Determination of Benefits:** MetLife will compute and verify disability benefit amounts and prepare and provide to Participants, when appropriate, statements reflecting the amount of disability benefits payable and the reasons, as required by ERISA, why a Claim for disability benefits has been denied in whole or in part.

4. **Advise on Verification of Coverage and Claim Submission:** MetLife will provide Citigroup Inc. with advice and assistance regarding procedures for verification of coverage and disability benefits Claim submission.

5. **Standard Claim Forms:** MetLife will provide Citigroup Inc. with standard forms which may be used for disability benefits Claim submission and processing. Customer will not use non-standard Claim forms without first consulting with MetLife.

6. **Advice on Applying for Social Security Disability Benefits:** MetLife will provide advice on how to apply for Social Security Disability Income Benefits to employees when MetLife determines they may be entitled to receive such benefits, and in appropriate cases, MetLife will assist employees in applying for such benefits.

7. **Reduction of Benefits Provisions:** MetLife will administer the Program's required reductions and/or offsets from disability benefit payments in accordance with and subject to the terms and conditions of the Program.

8. **Rehabilitation Services:** If the Program provides rehabilitation services for participants, MetLife will conduct an initial evaluation of claims to determine whether coordination of rehabilitation services is appropriate. When deemed appropriate, MetLife will coordinate rehabilitation services.

9. **Customer Service:** MetLife will maintain a telephone line available 8:00 a.m. – 8:00 p.m. Eastern Standard Time to respond to Citigroup Inc. and/or participant questions concerning MetLife's Claim Processing Services.

10. **Quality Management Review:** MetLife will conduct periodic internal quality Management Reviews.

CB00139

**Section 5:**                    **REPORT SERVICES**

A.    **Reports Furnished at no Additional Charge:**

MetLife will furnish to Customer the following management reports at no additional charge:

**<u>Report</u>**

**NONE**

B.    **Reports Furnished at Additional Charge:**

At Customer's request, MetLife will furnish to Customer, for Additional Fees, the following management reports. At Customer's request, MetLife will advise Customer in advance of the charge for each such report, or the rate by which the charge is determined. Such charges will be payable in the manner set forth in the **Service Fee Section, Section C.**

**<u>Report</u>**

**NONE**

C.    **Other Reports:**

If Customer requests any additional management reports which MetLife is capable of producing at a cost Customer is willing to pay, MetLife will furnish them to Customer for Additional Fees, which will be payable in the manner set forth in the **Service Fee Section, Section C.**

8

CB00140

**Section 6:**                    **ADDITIONAL SERVICES**

MetLife will consult with Customer at their request to determine if Additional Services can or should be performed by MetLife. If MetLife is willing and able to perform such services, it will advise Customer of the charge for such services or the rate by which the charge is determined. If MetLife sends Customer written notice of the proposed charge for any Additional Service requested, Customer will be deemed to have accepted the charge quoted by MetLife for the service(s) if it has not objected to the proposed charge or withdrawn the request for such additional service(s) within fifteen (15) business days after the date of such notice.

CB00141

**Section 7:**                                                      **SERVICE FEES**

A.    **Service Fees:** The **"Service Fees"** are the amounts payable by Customer to MetLife for the services rendered and supplies provided to Customer by MetLife pursuant to this Agreement. The Service Fees include the Monthly Service Fee, Additional Fees, and Service Fee Adjustments.

B.    **Monthly Service Fee:**

   1.    The **"Monthly Service Fee"** will be determined in the manner set forth in the **Monthly Service Fee Appendix.**

   2.    During each Contract Period, including the First and Second Contract Period, the Monthly Service Fee may be adjusted, as deemed appropriate by MetLife, each time there is:

   a.    an increase or decrease of 10% or more in the number of Program Participants; and/or

   b.    a material change in the Program which MetLife reasonably anticipates may increase or decrease the amount of Program Benefits payable thereunder by 10% or more; and/or

   c.    an increase of 10% or more in administrative costs, which include legal fees and costs.

   3.    Except as described in the preceding paragraph, for each Contract Period other than the First and Second Contract Period, MetLife reserves the right to establish the applicable rates for the calculation of the Monthly Service Fee for that Subsequent Contract Period.

   a.    If MetLife provides notice to Customer of such applicable rates at least thirty (30) days before the first day of a Subsequent Contract Period, these rates will be effective as of the first day of the subsequent Contract Period unless MetLife expressly agrees, in writing, to a different effective date.

   b.    If MetLife provides notice to Customer of such applicable rates less than thirty (30) days prior to the first day of a Subsequent Contract Period, these rates will be effective as of the thirtieth (30th) day following mailing by MetLife of notice of such rates to Customer unless MetLife expressly agrees, in writing, to a later effective date.

   4.    Payments of the Monthly Service are due to MetLife on the first (1st) day of each calendar month.

C.    **Additional Fees:** Customer will pay to MetLife the fees for any services actually provided which are described in the **Additional Services Section** and the **Report Services Section**, which are in addition to and not included in the Monthly Service Fee. The fees for such additional services will be MetLife's then current standard charge for such services at the time the services are rendered. Payment of Additional Fees is due within thirty (30) days after Customer receives written notice of the amount of such fees for such additional services which have been provided, *unless the Parties agree to include those Additional Fees in the Service Fee Adjustments.*

CB00142

**D.    Service Fee Adjustments:**

1.   At the conclusion of each Contract Period (or at the conclusion of each year if any Contract Period is more that one year) the Monthly Service Fee may be adjusted to take into account any variations between the factors used to determine the Monthly Service Fee at the time it was due and payable and actual experience determined by the books and records of Customer.

2.   If it is determined that Customer is entitled to a refund of the amounts paid during the prior year, the amount due Customer shall be credited to the subsequent Monthly Service Fees due. However, if this Agreement has been terminated, the amount due Customer shall be applied to any amounts due and payable to MetLife, and any excess shall be returned to Customer within thirty (30) days after the amount has been determined.

3.   If it is determined that MetLife is entitled to an additional payment, Customer shall pay such amount within thirty (30) days after the date of the written notice of the amount due on account of such adjustment.

**E.    Late Payment Charge:**

1.   **Assessment of Late Payment Charge:** If MetLife does not receive a payment on or before its due date, the unpaid amount is subject to a **"Late Payment Charge".** The Late Payment Charge will be assessed on a per diem basis each day beginning on the day after the payment due date and ending the day MetLife receives payment. The Late Payment Charge will be calculated based on an annual percentage rate determined by adding seven (7) percentage points to the average of the rates fixed at the first weekly auction of (6) month Treasury bills in each of the twelve (12) prior months. Late Payment Charges are due and payable within thirty (30) days following the date of written notice of the amount due.

2.   **Change of Late Payment Charge Formula:** MetLife reserves the right to change the formula for calculating the Late Payment Charge. The new Late Payment Charge formula will be effective as of the thirtieth (30th) day following mailing of such notice to Customer.

3.   **Waiver of Late Payment Charge:** The Late Payment Charge will be waived with respect to the Monthly Service Fee if payment of it is received by MetLife by the fifteenth (15th) day following its due date. MetLife may, in its sole discretion waive any other Late Payment Charge, but any such waiver by MetLife will not prejudice MetLife's right to receive a Late Payment Charge on any other (previous or subsequent) payment due under this Agreement.

11

CB00143

## Section 8.                      SUMMARY PROGRAM DESCRIPTION

A.  **Customer to Furnish Copy to MetLife:** Customer will cause to be furnished to MetLife a copy of the Program Documents, including, but not limited to each applicable SPD and any future modifications to any applicable SPD. A copy of each applicable SPD in effect as of the effective date of this Agreement will be deemed to be annexed as the **Summary Program Description Appendix.** Customer covenants that it will make a copy of each applicable SPD available to MetLife within thirty (30) days after it becomes available, and upon receipt of such copy by MetLife, each such copy will be deemed to be annexed as the **Summary Program Description Appendix** . In addition, notwithstanding the requirements of this Agreement with respect to "Modification of Agreement" each time an SPD is itself modified, the **Summary Program Description Appendix** will be deemed to have been      amended to incorporate such modified SPD as of the time MetLife has been given notice of the changes reflected in such modified SPD.

B.  **Customer to Furnish Advance Notice of Program Changes:** Customer agrees that MetLife should be provided reasonable advance notice of all Program changes related to this Agreement. Therefore, Customer covenants that it will cause MetLife to be furnished with such advance notification of any change in the Program which may affect the payment of Program Benefits or other services provided by MetLife under this Agreement.

C.  **Customer Liability for Program Benefits:** Liability for Program Benefits is always the obligation of the Customer. MetLife does not insure and is not liable for Program Benefits. Customer covenant that they will cause written notice to be provided to Participants disclosing Customer's liability for Program Benefits.

12

CB00144

**Section 9:**        **CONFIDENTIAL INFORMATION AND USE
OF NAMES, SERVICE MARKS AND TRADEMARKS**

A.     **Confidential Information:** Customer and MetLife acknowledge that in discharging their obligations under this Agreement they may disclose or make available to each other Confidential Information.

B.     **Identification of Confidential Information:** Customer and MetLife each agree to make every reasonable effort under the circumstances to identify to each other Confidential Information at the time of its disclosure and to fully protect and preserve the confidential, proprietary and trade secret nature of each other's Confidential information.

C.     **Non-Disclosure of Confidential Information:** Customer and MetLife each agree not to disclose the other's Confidential Information to any other person, firm or entity without obtaining the other's prior written consent.

D.     **Examiners and Confidential Information:** Customer understands and agree that if Customer retains the services of a third party (**"Examiner"**) to perform an Examination, review or audit in which Confidential Information may be revealed, MetLife will require the Examiner to execute a Confidentiality Agreement in a form approved by MetLife before the Examination begins. A sample of MetLife's approved Confidentiality Agreement is annexed as the **Confidentiality Agreement Appendix.**

E.     **Limitation on Non-Disclosure Obligation:** Customer and MetLife each agree that the obligations regarding Confidential Information shall not apply to any information that was previously disclosed by the other without restriction or that has become generally available to the public through authorized disclosure.

F.     **Individually Identifiable Participant Information:**

    1.     Names, addresses, phone numbers, social security numbers, dates of birth and other personal information relating to Participants is deemed Confidential Information. However, MetLife may use non-individually identifiable information obtained from this Confidential Information for the purpose of data compilation, statistical analyses and other studies.

    2.     Medical information related to Participants is deemed Confidential Information (**"Confidential Medical Information"**), and will be disclosed:

       a.     pursuant to written authorization from the Participant;

       b.     as required or permitted by applicable law.

       MetLife may use non-individually identifiable information obtained from Confidential Medical Information for the purposes of data compilation, statistical analysis and other studies, and Customer recognizes that such compilations, analyses and studies are the exclusive property of MetLife and may be used as deemed appropriate by MetLife.

G.     **Unauthorized Disclosure of Confidential Information:** The Parties agree that unauthorized disclosure of Confidential Information is a material breach of the Agreement resulting in irreparable harm to the Party whose Confidential Information has been improperly disclosed for

CB00145

which the payment of money damages is inadequate, such damages being difficult to ascertain in any event. The Parties agree, therefore, that the injured Party may, at its sole option:

1.    obtain immediate injunctive relief in any court of competent jurisdiction enjoining any further such breach(es) and the Parties consent to the entry of judgment for injunctive relief; and/or

2.    immediately terminate this Agreement by giving the other Party written notice.

H.    **No Use of Service Marks or Trademarks:** Each Party agrees that, without the other Party's written consent signed by an officer of the Party, it will not use that other Party's service marks, trademarks, or other legally protected property rights.

I.    **Name of Program:** The name of the Program shall be used in any customized Participant communication materials. Unless otherwise agreed, generic literature will also be used in communicating the terms and conditions of the Program.

J.    **Customer's Approval of Material Used by MetLife:** All communications developed by MetLife specifically for Customer and any formal advertising or promotional pieces which specifically refer to the Program must receive Customer's approval prior to release, which approval will not be withheld unreasonably.

K.    **MetLife's Approval of Material Used by Customer:** All communications developed by Customer that refer to MetLife must receive MetLife's approval prior to release, which approval will not be withheld unreasonably.

CB00146

**Section 10:**                           **EXAMINATIONS**

A.    **Examination of MetLife:** Subject to the provisions of this Agreement regarding Confidential Information, one time during each Contract Period, MetLife will make available for examination (which is deemed to include examination, review and/or audit (during MetLife's normal business hours) its files, books, and records pertaining to the Program.

B.    **Charges for Examination of MetLife:** If more than one examination during any Contract Period is requested Customer agrees that it will be obligated to pay an additional charge to MetLife for each examination which will be calculated by MetLife based upon its then current standard charges.

C.    **Confidentiality Agreement:** No person or entity may conduct an examination pursuant to this **Section 10** without first executing an Examiner's Confidentiality Agreement in the form set forth in the **Confidentiality Agreement Appendix.**

15

CB00147

**Section 11:**                                        **TAXES**

A.     **Customer Obligation to Pay Taxes:** If at any time on or after the effective date of this Agreement, MetLife is required to pay any federal, state or local taxes directly attributable to:

        1.     Program Benefits paid pursuant to this Agreement,

        2.     fees paid or payable to MetLife for services provided under this Agreement, or

        3.     any other measurement related to the size or scope of the Program (such as the number of employees or individuals covered by the Program, etc.),

    (collectively **"Taxes"**), Customer will pay MetLife an amount equal to such Taxes plus an amount equal to any additional taxes, interest, and/or penalties directly attributable to such Taxes, unless those additional taxes, interest, and/or penalties were incurred solely because of the negligence of MetLife. The state and local Taxes described in the preceding sentence shall not include any income or similar tax imposed on MetLife that is attributable to this Agreement.

B.     **Payment Due Date:** Customer will pay these additional amounts to MetLife within thirty (30) days following Customer's receipt of written notice from MetLife of the additional amounts due. Payments not received by the thirtieth (30th) day are subject to the Late Payment Charge described in the **Service Fees Section.**

C.     **Determination That Taxes Were Not Valid:** Customer will pay these additional amounts even if the validity of the Taxes has not been finally determined. If it is finally determined that such Taxes were not valid, MetLife will refund to Customer an amount equal to those additional amounts previously paid by Customer plus interest determined in accordance with MetLife's regular procedures then in effect, less Customer's pro rata share of any expenses incurred by MetLife, as determined by MetLife, in contesting the validity of such Taxes.

D.     **Penalties:** If Customer has paid MetLife the amount described in Section A of this **Section 11**, but as of the time of such payment, interest and/or penalties had not yet accrued or been assessed, Customer will not be required to pay any additional amount to MetLife based upon or measured by subsequently accrued or assessed interest and/or penalties.

CB00148

**Section 12:**                    **PROGRAM BENEFITS LITIGATION**

A.    **Definition of Program Benefits Litigation:** For the purposes of this **Section 12, "Program Benefits Litigation"** means a demand asserted or litigation, proceedings or arbitration, commenced by or on behalf of an actual or putative Participant, Program beneficiary to recover Program Benefits and/or extracontractual damages, including, but not limited to, attorney fees, court costs and expenses incurred in connection with such demand, litigation, proceedings or arbitration.

B.    **Customer Liability for Program Benefits:** Customer is liable for the full amount of any Program benefits paid as a result of Program Benefits Litigation as well as any legal fees and costs recovered by the Participant or Program Beneficiary in connection therewith. In no event will MetLife be liable for any amount of Program Benefits paid as a result of Program Benefits Litigation or any amount of legal fees or costs recovered by the Participant or Program Beneficiary in connection therewith. If MetLife advances payment for same, Customer will reimburse MetLife for the full amount advanced within thirty (30) days of the date of MetLife's written notice of the amount due. Any late payment shall be subject to the **Late Payment Charge.**

C.    **If Program Benefits Litigation is Brought Against MetLife:** If Program Benefits Litigation is brought against MetLife:

1.    MetLife will provide written notice to Customer, as soon as practicable, but in no event more than sixty (60) days after MetLife receives notice of Program Benefits Litigation, and will, at reasonable intervals provide Customer with information with respect to the status of the Program Benefits Litigation.

2.    MetLife will make every reasonable effort to obtain Customer's agreement in advance of settling Program Benefits Litigation; Customer shall not unreasonably deny MetLife authority to settle the lawsuit.

3.    MetLife will select and retain counsel and will assume liability for the payment of MetLife's own legal fees, costs and disbursements in connection with Program Benefits Litigation until the date notice is given to terminate this Agreement as described in the **Term/Termination Of This Agreement Section;** upon notice to terminate this Agreement by either Party for any reason, MetLife's defense obligations will also terminate as to future Program Benefits Litigation, if any.

4.    Customer will provide MetLife with reasonable cooperation in the defense of Program Benefits Litigation.

5.    MetLife will provide Customer with reasonable cooperation in the event Customer elects to intervene as a party in such Program Benefits Litigation.

17

CB00149

**D.**    **If Program Benefits Litigation is Brought Against Customer and/or the Program:** If Program Benefits Litigation is brought against Customer and/or the Program:

1.    In order that MetLife may remain fully informed for the purposes of providing appropriate services under this Agreement, Customer will provide written notice to MetLife as soon as practicable, but in no event more than thirty (30) days after Customer receives notice of Program Benefits Litigation and they will, at reasonable intervals, provide MetLife with information with respect to the status of the Program Benefits Litigation.

2.    Customer will select and retain counsel and will assume liability for the payment of legal fees, costs and disbursements in connection with Program Benefits litigation brought against Customer and/or the Program.

3.    MetLife will provide Customer with reasonable cooperation in defense of Program Benefits Litigation.

4.    Customer will provide MetLife with reasonable cooperation in the event MetLife elects to intervene as a party in such Program Benefits Litigation.

**E.**    **If Program Benefits Litigation is Brought Against MetLife and Customer:** If Program Benefits Litigation is brought against MetLife and Customer:

1.    Each will provide the other written notice of the lawsuit as soon as practicable, but in no event shall such notice exceed the requirements for each party stated in paragraphs C.1. and D.1. of this **Section 12.**

2.    MetLife will make every reasonable effort to obtain Customer's agreement in advance of settling Program Benefits Litigation; Customer shall not unreasonably deny MetLife authority to settle the lawsuit.

3.    Each party shall select and retain their own counsel and will assume liability for the payment of their own legal fees, costs and disbursements in connection with Program Benefits Litigation, except as stated in paragraph E.4. of this **Section 12**, in accordance with paragraph C.2. of this **Section 12**, upon notice to terminate this Agreement by either party for any reason, MetLife's defense obligations will also terminate as to future Program Benefits Litigation, if any.

4.    Each will provide the other with reasonable cooperation in the defense of Program Benefits Litigation.

5.    MetLife shall have the right of first refusal in hiring counsel to represent it; to the extent it is reasonable, and in order to control legal expenses, costs, and disbursements, but Customer may not prevent MetLife from using counsel of its choice.

CB00150

**Section 13:**                    **INDEMNIFICATION OF CUSTOMER**

A.    **Definitions:** For the purposes of this **Section 13:**

1.    **"Damages"** means settlements, awards and judgments (not including extracontractual damages, Program Benefits or those attorney fees, court costs and expenses described in the **Program Benefits Litigation Section** of this Agreement) and reasonable legal fees, court costs and expenses incurred by Customer to resolve a **"Non-Party Claim".**

2.    **"Non-Party Claim"** means a demand asserted or litigation, proceedings or arbitration commenced by a person or entity other than Customer or MetLife to obtain a settlement, award or judgment against Customer or the Program. However, a Non-Party Claim does not include any portion of a demand asserted or litigation, proceeding or arbitration commenced which has been defined under this Agreement as Program Benefits Litigation. The rights and obligations of the Parties with respect to Program Benefits Litigation are fully described in the **Program Benefits Litigation Section** of this Agreement.

B.    **Indemnification by MetLife:** MetLife will indemnify Customer against Damages if and at such time as it has been determined that:

1.    Customer incurred Damages arising from MetLife's breach of this Agreement, or grossly negligent, intentionally tortious, fraudulent or criminal act or omission by MetLife in connection with this Agreement or the Program; and

2.    Customer first received notice (oral or written) of the Non-Party Claim no later than one year after this Agreement terminated; and

3.    Customer provided written notice to MetLife of the Non-Party Claim as soon as practicable, but in no event more than sixty (60) days, after Customer or first received notice of the Non-Party Claim; and

4.    The Damages did not arise from the acts or omissions of Customer in connection with this Agreement or the Program or from a MetLife act or omission undertaken at the express direction of Customer.

If the Damages arose from the acts or omissions of Customer, the obligation of MetLife to indemnify Customer shall be reduced to the proportionate share of the Damages which is attributable to MetLife's acts or omissions.

C.    **Discretion to Resolve Non-Party Claim:** Customer will have discretion to resolve a Non-Party Claim in a reasonable manner and amount under the circumstances. However, failure to act reasonably in resolving a Non-Party Claim will relieve Metropolitan Life Insurance Company of its obligations to indemnify only if and to the extent it has been prejudiced by this failure.

D.    **No Rights Afforded to Third Parties:** Nothing in this **Section 13** of the Agreement is intended, nor shall it be interpreted, to give any third party, including but not limited to Participants, any right, claim or cause of action against Customer or MetLife.

CB00151

**Section 14:**                    **INDEMNIFICATION OF METLIFE**

A.    **Definitions:** For the purposes of this **Section 14**:

1.    **"Damages"** means settlements, awards and judgments (not including extracontractual damages, Program Benefits or those attorney fees, court costs and expenses described in the **Program Benefits Litigation Section** of this Agreement ) and reasonable legal fees, court costs and expenses incurred by MetLife to resolve a **"Non-Party Claim"**.

2.    **"Non-Party Claim"** means a demand asserted or litigation, proceedings or arbitration commenced by a person or entity other that Customer or MetLife to obtain a settlement, award or judgment against MetLife arising from an act or omission by Customer in connection with this Agreement of the Program. However, a Non-Party Claim does not include any portion of a demand asserted or litigation, proceeding or arbitration commenced which has been defined under this Agreement as Program Benefits Litigation. The rights and obligations of the Parties with respect to Program Benefits Litigation are fully described in the **Program Benefits Litigation Section** of this Agreement.

B.    **Indemnification by Customer:** Customer will indemnify MetLife against Damages if and at such time as it has been determined that:

1.    MetLife has incurred Damages arising from Customer's breach of this Agreement, or grossly negligent, intentionally tortious, fraudulent or criminal act or omission by Customer in connection with this Agreement or the Program; and

2.    MetLife first received notice (oral or written) of the Non-Party Claim no later than one year after this Agreement terminated; and

3.    MetLife provided written notice to Customer of the Non-Party Claim as soon practicable, but in no event more than sixty (60) days, after MetLife first received notice of the Non-Party Claim; and

4.    The Damages did not arise from MetLife's own acts or omissions in connection with this Agreement or the Program or from a Customer act or omission undertaken at MetLife's express direction.

If the Damages arose from the acts or omissions of MetLife, the obligation of Customer to indemnify MetLife shall be reduced to the proportionate share of the Damages which is attributable to Customer's acts or omissions.

C.    **Discretion to Resolve Non-Party Claim:** MetLife will have discretion to resolve a Non-Party Claim in a reasonable manner and amount under the circumstances. However, failure to act reasonably in resolving a Non-Party Claim will relieve Customer of their obligations to indemnify only if and to the extent it has been prejudiced by this failure.

D.    **No Rights Afforded to Third Parties:** Nothing in this **Section 14** of this Agreement is intended, nor shall it be interpreted, to give any third party, including but not limited to Participants, any right, claim or cause of action against Customer or MetLife.

CB00152

## Section 15:          TERM/TERMINATION OF THIS AGREEMENT

**A.**    **Continuity of Agreement:** This Agreement shall continue in effect during the First and each Subsequent Contract Period unless terminated in accordance with this **Section 15.**

**B.**    **Termination of the Agreement:**

**Date of Termination:** Notwithstanding any other term or condition of this Agreement, this Agreement will terminate on the earliest of:

1    the thirtieth (30th) day following the date of written notice by Customer or MetLife from the other of the intention to terminate the Agreement; or

2.    five (5) business days after the date of written notice of MetLife's intention to terminate this Agreement because the Monthly Service Fee or other service fee or charge due from Customer to MetLife under this Agreement has not been paid when due, unless Customer has remitted all outstanding unpaid amounts before that date. MetLife's failure to treat this Agreement as terminated in accordance with this paragraph shall not be deemed to be a waiver of MetLife's right to terminate this Agreement in accordance with this Paragraph at a subsequent time; or

3.    immediately, as provided for in paragraph G.2. of the **Confidential Information and Use of Names, Service Marks, and Trademarks Section** of this Agreement.

4.    any other date determined by written agreement among the Parties.

21

CB00153

## Section 16:                      GENERAL PROVISIONS

A.    **Agreement Counterparts:** This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and these counterparts will constitute but one and the same instrument.

B.    **Certification and Licensing:** MetLife represents that it has obtained all licensing and certifications presently required by local, state or federal law; covenants that it will continue to obtain and maintain all such necessary licensing and certifications; and that in performing services under this Agreement, MetLife will act within the scope of such licenses and certifications.

C.    **Choice of Law:** This Agreement and the obligations of the Parties shall be governed by the law of the State of New York.

D.    **Compliance:** MetLife and Customer covenant that they will each remain in full compliance with all applicable laws and regulations.

E.    **Cooperation:** The Parties will provide each other with statistical and other information, in such forms and at such intervals as are mutually acceptable, which may reasonably be needed by a Party to perform services in connection with this Agreement or the Program.

F.    **Entire Contract:** This Agreement constitutes the entire contract between the Parties and is intended to supersede any and all prior written or verbal agreements, proposals or representations by and among the Parties.

G.    **Independent Contractor Status:** In fulfilling its obligations in connection with this Agreement and the Program, MetLife acts in the capacity of independent contractor as to Customer.

H.    **Liability Coverage:** Each Party Covenants, respectively, that during the term of this Agreement and for a reasonable period of time following termination of this Agreement, it will maintain prudent levels of liability protection either through third party liability coverage or self-insurance or a combination thereof with respect to its performance of services in connection with this Agreement and the Program; and each will provide the other, upon reasonable request, with evidence of such coverage and will provide reasonable advance notice to the other of any material change in the liability protection.

I.    **Limitation on Actions:** Any suit between or among MetLife and any other Party, arising from the obligations of any Party in connection with this Agreement or the Program, must be instituted within the earlier of two years from the date that the alleged wrongful act or omission occurred or two years from the date this Agreement terminates.

J.    **Modification of Agreement:** Unless otherwise expressly provided in this Agreement, changes to this Agreement may be made only with agreement of all Parties evidenced in a writing signed by authorized officers representing each Party.

CB00154

K. **Notices:** Unless and until the Parties give written notice otherwise, all notices under this Agreement shall be in writing and shall be addressed as follows:

**Metropolitan Life Insurance Company**
**501 US Highway 22**
**Bridgewater, New Jersey 08807-0891**
**Attention: Mark Moskowitz**
**Vice-President**


**Citigroup Inc., as Program Sponsor**
**1 Court Square, 15th Floor**
**Long Island City, New York, 11120**
**Attention:**

L. **Survival:** Unless otherwise specifically provided in this Agreement, the obligations of the Parties shall survive termination of this Agreement when necessary to effect the intent of the Parties as herein expressed.

M. **Waivers:** The waiver by any Party of any breach of any provision of this Agreement by another Party, shall not be construed as a waiver of any subsequent breach of the same or any other provision of this Agreement. The failure to exercise any right under this Agreement shall not operate as a waiver of any such right.

N. **Headings:** Headings in this Agreement shall not be used to interpret or construe its provisions.

O. **Severability:** In the event that any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this Agreement.

CB00155

# ADMINISTRATIVE SERVICES AGREEMENT EXECUTION PAGE

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their duly authorized officers.

**Metropolitan Life Insurance Company**
One Madison Avenue
New York, New York 10010


By: _____
       Vice-President

_____
Date


**Citigroup Inc.**
1 Court Square, 15ᵗʰ Floor
Long Island City, New York, 11120


By: _____
       Vice-President

_____
Date

24

CB00156

## MONTHLY SERVICE FEE - APPENDIX

### Applicable Fees

**First Contract Period: 01/01/02 to 12/31/02**

| Description | Monthly Fee Per Employee |
|---|---|
| **Salary Continuance Advice** | |
| Citigroup Inc., and all operating companies except CitiFinancial | $2.29 |
| CitiFinancial | $2.45 |

A- 2

CB00157

## SUMMARY PROGRAM DESCRIPTION APPENDIX

A.    Customer and MetLife acknowledge that copies of the Summary Program Description are not available as of the effective date of this Agreement. Customer agrees to furnish to MetLife copies of every Summary Program Description subject to this Agreement within thirty (30) days after they become available, at which time the Parties acknowledge, agree, and understand that they will be incorporated by reference in their entirety as this **Summary Program Description Appendix.**

B.    Customer will continue to furnish to MetLife copies of every revised summary Program description and/or every summary of any material modification that are the subject of this Agreement within thirty (30) days after they become available, at which time the Parties acknowledge, agree and understand that they will be incorporated by reference in their entirety as this **Summary Program Description Appendix.**

A- 3

CB00158

# EXAMINER'S CONFIDENTIALITY AGREEMENT APPENDIX

NONDISCLOSURE AND CONFIDENTIALITY AGREEMENT ("Agreement") entered into by and between _____ ("Examiner") and Metropolitan Life Insurance Company ("MetLife"). These Parties acknowledge and agree as follows:

1. **ASA:** Citigroup Inc. (**"Employer"**) and MetLife entered into an Administrative Services Agreement (**"ASA"**) under which all services relate to Employer's Salary Continuance Program (**"Program"**). Pursuant to the ASA, Employer has retained Examiner to perform an examination, audit or other evaluation of the files, books and/or records of MetLife pertaining to the Program, as detailed in the **Examinations Section** annexed hereto (**"Examination"**).

2. **Consideration:** Employer has requested that solely for purposes of the Examination, MetLife disclose to Examiner certain documents, statistical information and other information that commercially valuable, confidential, proprietary and/or trade secret (**"Confidential Information"**). MetLife has agreed to such disclosure subject to the terms of this Agreement. There is mutual consideration for this Agreement.

3. **Examination Date:** The Examination shall take place on the date indicated in the **Examinations Section** or such other date mutually agreed upon by the Parties.

4. **Confidential Information:** All documents and information of MetLife, its agents, subsidiaries and affiliates, disclosed to Examiner in connection with the Examination, including all copies thereof, constitutes Confidential Information disclosed by MetLife to Examiner on a confidential basis under this Agreement, and must be used by Examiner only as permitted by this Agreement. Confidential Information shall not include information: (i) disclosed to Examiner without restriction prior to the Examination or (ii) generally available to the public prior to the Examination through authorized disclosure.

5. **Title:** Title to Confidential Information will remain at all times in MetLife and no transfer of any interest therein is granted.

6. **Use:** Examiner (a) shall not use Confidential Information (deemed to include using, exploiting, duplicating, recreating, modifying, decompiling, disassembling, reverse engineering, translating, creating derivative works or disclosing Confidential Information to another person or permitting any other person to do so) except for purposes of the Examination; (b) shall limit use of Confidential Information only to its authorized employees (deemed to include employees as well as individuals who are agents or independent contractors of Examiner) who have a need to know for purposes of the Examination; (c) shall not copy Confidential Information unless express, prior approval of MetLife to do so has been obtained; and, (d) shall, if required by subpoena or other legal process to disclose Confidential Information, give MetLife reasonable prior notice of such disclosure.

7. **Conflicts of Interest:** Examiner shall not use Confidential Information in any manner to further its own interests other than in performing the Examination.

8. **Relinquishment:** Examiner shall at the conclusion of the Examination relinquish to MetLife all Confidential Information. If during the course of the Examination it is discovered that this Agreement has been breached by Examiner then all Confidential Information shall be relinquished upon demand by MetLife.

A- 4

CB00159

9.   **Legal Privacy Requirements:** Certain Confidential Information is subject to legal privacy requirements, a violation of which will cause irreparable harm to MetLife. Examiner shall comply with all such requirements.

10.  **Persons Bound:** This Agreement binds Examiner, its successors, assigns, agents, employees, subsidiaries and affiliates and Examiner agrees that each, prior to accessing Confidential Information, will have agreed to the terms of this Agreement. This Agreement binds MetLife, its successors, assigns, agents, subsidiaries and affiliates and the rights given by this Agreement to MetLife also extend to these persons and entities.

11.  **Damages and Injunctive Relief:** Unauthorized use of Confidential Information by Examiner is a material breach of this Agreement resulting in irreparable harm to MetLife for which the payment of money damages is inadequate, such damages being difficult to ascertain in any event. It is agreed that MetLife, upon adequate proof of unauthorized use, may immediately obtain injunctive relief in any court of competent jurisdiction enjoining any continuing or further breaches and may obtain entry of judgment for injunctive relief. Examiner consents to said injunctive relief and judgment. Nothing in this Agreement shall be construed to limit MetLife's remedies at law or equity in the event of a breach.

12.  **Term of Agreement:** This Agreement shall remain in full force and effect so long as any Confidential Information remains commercially valuable, confidential, proprietary and/or trade secret, but in no event less than three (3) years from the date of Examination.

13.  **Assignments:** Neither this Agreement nor Examiner's rights or obligations hereunder may be assigned without MetLife's prior written approval.

14.  **General:** (a) This Agreement is the entire understanding between the parties as to the subject matter hereof. (b) No modification to this Agreement shall be binding upon the parties unless evidenced in a writing signed by the party against whom enforcement is sought. (c) Headings in this Agreement shall not be used to interpret or construe its provisions. (d) The alleged invalidity of any term shall not affect the validity of any other term. (e) This Agreement may be executed in counterparts.

The parties have caused their authorized representatives to execute this Agreement.

Metropolitan Life Insurance Company      _____

By: _____      By: _____

Title: _____      Title: _____

Date: _____      Date: _____

CB00160